## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------------x

In re

TELEGLOBE COMMUNICATIONS CORPORATION, TELEGLOBE USA INC., OPTEL TELECOMMUNICATIONS, INC., TELEGLOBE HOLDINGS (U.S.) CORPORATION, TELEGLOBE MARINE (U.S.) INC., TELEGLOBE HOLDING CORP., TELEGLOBE TELECOM CORPORATION, TELEGLOBE INVESTMENT CORP., TELEGLOBE LUXEMBOURG LLC, TELEGLOBE PUERTO RICO INC. and TELEGLOBE SUBMARINE INC.,

Chapter 11
Case No. 02-11518 (MFW)
Jointly Administered

Debtors.

-----------------------------------------------------------------------x

TELEGLOBE COMMUNICATIONS CORPORATION, TELEGLOBE USA INC., OPTEL TELECOMMUNICATIONS, INC., TELEGLOBE HOLDINGS (U.S.) CORPORATION, TELEGLOBE MARINE (U.S.) INC., TELEGLOBE HOLDING CORP., TELEGLOBE TELECOM CORPORATION, TELEGLOBE INVESTMENT CORP., TELEGLOBE LUXEMBOURG LLC, TELEGLOBE PUERTO RICO INC., TELEGLOBE SUBMARINE INC., and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TELEGLOBE COMMUNICATIONS CORPORATION, et al.,

Plaintiffs,

v.

Adv. Pro. No._____

BCE INC., MICHAEL T. BOYCHUK, MARC A. BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN, STEWART VERGE, JEAN C. MONTY, RICHARD J. CURRIE, THOMAS KIERANS, STEPHEN P. SKINNER, and H. ARNOLD STEINBERG,

Defendants.

-----------------------------------------------------------------------x

## <u>COMPLAINT</u>

Teleglobe Communications Corporation ("TCC") and its above-captioned affiliated

debtors and debtors in possession (collectively, "Debtors"), by their counsel, Richards Layton &

Finger, P.A., and the Official Committee of Unsecured Creditors of the Debtors (the

"Committee"), by its co-counsel, Rosenthal, Monhait, Gross & Goddess, P.A. and Hahn & Hessen LLP, as and for their complaint against the above-captioned defendants, allege as follows:

**INTRODUCTION**

*Nature of the Action*

1.      This proceeding seeks to hold the Debtors' parent company, BCE Inc. ("BCE"), accountable for abandoning the Debtors after causing them to incur billions of dollars of debt. After repeatedly promising to fund the Debtors' construction of a worldwide communications network, BCE, Canada's largest telecommunications company, precipitously terminated its financial support for its subsidiaries' multi-billion dollar capital expenditure program. Left with only two weeks of operating cash, substantial debt, and an incomplete network; stripped of key personnel who had been installed by (and resigned at the behest of) BCE; and with no feasible business plan to continue operations in the absence of BCE's financial support, the Debtors filed for bankruptcy protection and began liquidating their assets. As demonstrated below, BCE committed both publicly and in writing to fund the Debtors' operations, and the only reason that no formal bilateral contract exists is because BCE installed its own personnel as directors and officers of the subsidiaries, and through them exerted complete domination and control over the Debtors' operations and finances for the benefit of BCE. These directors and officers, who implemented the capital expenditure program based upon BCE's directions and ultimately unfulfilled promise of financial support, abdicated and breached the fiduciary duties imposed upon them by Delaware law.

2.      This action seeks damages arising from, among other things:  BCE's wrongful failure to honor its funding commitments to the Debtors; BCE's wrongful exercise of complete domination and control over the Debtors solely for BCE's benefit; the abdication by members of

2

the boards of directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, of their fiduciary duties in the face of BCE's unbridled exercise of control; and breaches of fiduciary duties by directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, many of whom simultaneously served as directors and/or officers of BCE, and whose divided loyalties caused great damage to the Debtors and their creditors.

*Teleglobe and BCE*

3.    Teleglobe, Inc. ("TI") and its various direct and indirect subsidiaries initially were in the business of providing long distance voice communications from Canada to the world. Formed in 1950 as the Canadian Overseas Telecommunications Corporation, TI originally was designated as the exclusive provider of telecommunications services to and from Canada, and was a traditional government owned monopoly.  TI operated as a "carrier's carrier," that is, it provided cable and other long distance connections from Canada to the rest of the world through its subsidiaries and affiliates.  As part of its business, TI and its subsidiaries and affiliates (including the Debtors) had business relationships with virtually every other large national telephone company, and had rights to route its calls through the cables and networks of virtually every major telephone consortium.  By the late 1990s, TI had revenue in excess of $1 billion annually.

4.    BCE is a Montreal, Canada based holding company with 2003 revenues of Cdn$19 billion.  BCE's holdings include Bell Canada, which provides local access, long distance, wireless services and high-speed internet access to its customers and is Canada's largest telephone company.  BCE also owns or controls significant interests in a major satellite television company; CTV, Canada's leading private broadcaster; *The Globe and Mail*, Canada's

leading national newspaper; CGI, one of Canada's largest information technology service companies; and companies providing eBusiness solutions to the financial services industry in North America and the health industry in Canada.

*BCE Acquires Teleglobe And Pursues Its "Grand Vision"*

5.      In May 1987, BCE acquired a minority interest in TI.  That interest thereafter was transferred to Bell Canada, then an 80% owned subsidiary of BCE.  As of February 2000, Bell Canada owned 23% of TI and the remaining 77% was owned by the investing public.

6.      In February 2000, TI publicly announced an agreement pursuant to which BCE would acquire all of the outstanding common shares of TI that were not already owned by Bell Canada (the "Acquisition").  The Acquisition was a major strategic transaction for BCE, which eventually paid billions of dollars (primarily in shares of its common stock) for the 77% of TI then owned by the public.

7.      By the time of the Acquisition, which closed in November 2000, the Debtors had commenced the build out of the "GlobeSystem," a state of the art worldwide network of fiber optic and satellite interlinks that allowed the simultaneous transmission of vast amounts of data, voice and other electronic traffic.  The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem.  As conceived, the GlobeSystem was to interconnect 160 cities around the world with scalable broadband service platforms that carriers and large commercial organizations could use for transmission of voice and data communications.  Each of these cities would be integrated seamlessly into a global communications network.  When fully completed in 2004, the GlobeSystem would have allowed customers to connect from business centers worldwide, regardless of their underlying network technology.

4

8.      From its very conception, the GlobeSystem was understood to be an enormous undertaking.  TI's directors were advised and expected that the system would take no less than $5 *billion* to build and an additional $1 billion to fund through to break-even operations.

9.      The Debtors, however, did not have $6 billion to finance the GlobeSystem.  Even before the November 2000 closing of the Acquisition, BCE and the BCE appointed directors and officers, some of whom were installed to run the Debtors *before* the closing of the Acquisition, realized that the bulk of the $6 billion cost of the GlobeSystem would have to be underwritten by BCE.  Notwithstanding this realization, BCE directed the Debtors to incur the tremendous cost of the continued development of the GlobeSystem.   The development of the GlobeSystem financially strapped the Debtors and, by the end of 2001, the Debtors had exhausted all sources of existing bank facilities and other available third party funding and were required to seek an additional $850 million from BCE, which BCE agreed to provide.

10.     After taking control of the Debtors and commencing to fund the GlobeSystem build out, but before it funded the additional $850 million to which it had committed, BCE unilaterally and precipitously withdrew funding support for the Debtors' operations without any prior notice, thereby dooming the Debtors to bankruptcy and, ultimately, liquidation.  This lawsuit is filed to address BCE's conduct, and that of the Debtors' and TI's directors and officers, as described in greater detail herein.

## JURISDICTION AND VENUE

11.     On May 15, 2002, TI, Teleglobe Financial Holdings Ltd., Teleglobe Canada Limited Partnership and Teleglobe Canada Management Services Inc. (collectively, the "Canadian Debtors") and the eleven Debtors, commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in

RLF1-2746253-1

Toronto, Canada.  On the same date, the Canadian Debtors and the Debtors filed petitions with this Court pursuant to 11 U.S.C. § 304 seeking ancillary relief.

12.    On May 28, 2002, after ancillary relief was refused for the Debtors, the Debtors filed petitions for relief in this Court (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are continuing in possession of their property and operating and managing their businesses as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

13.    On May 29, 2002, this Court consolidated the Chapter 11 Cases for procedural purposes only and granted their joint administration.

14.    The Office of the United States Trustee appointed the Committee on June 11, 2002.

15.    By Order dated April 28, 2004, this Court, over the opposition of BCE, authorized the Committee to prosecute, inter alia, claims against the officers and directors of the Debtors and causes of action related thereto as may be agreed upon between the Debtors and the Committee.

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a non-core proceeding pursuant to 28 U.S.C. § 157(b).  Both the Debtors and the Committee consent to the entry of final orders and/or judgments by this Court.  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## PARTIES

*The Debtors, TI and BCE*

17.    Each of the Debtors is a Delaware corporation (except for Teleglobe Puerto Rico Inc. ("TPR"), which is a Puerto Rico corporation), and is either a direct or indirect subsidiary of

TI, a corporation governed by the Canada Business Corporations Act ("CBCA") which had its principal place of business in Montreal, Province of Quebec, Canada.

18.     Prior to commencing the GlobeSystem project, the Debtors provided international long-distance telecommunications services, on a largely wholesale basis, to other telecom carriers in the U.S., Canada and abroad.   TCC, Teleglobe USA Inc. ("TUSA"), Optel Telecommunications, Inc. ("OTI") and certain other entities (collectively, the "TCC Group") accounted for approximately 60% of TI's revenues and were headquartered in Reston, Virginia. The TCC Group was TI's principal world-wide operating division responsible for the construction and implementation of the GlobeSystem project.

19.     BCE is and was at all material times a corporation governed by the CBCA with its principal place of business in Montreal, Province of Quebec, Canada.   BCE's stock is publicly traded and listed on the Toronto Stock Exchange and the New York Stock Exchange, among others.  BCE has appeared and filed proofs of claim in the Chapter 11 Cases.

*The Debtors' Director and Officer Defendants*

20.     Upon information and belief, defendant Michael T. Boychuk ("Boychuk") is a citizen and resident of Canada.  Boychuk was simultaneously a high-ranking officer or director of BCE, its Bell Canada subsidiary, TI, and several of the Debtors during material times relevant to this action.

21.     Upon information and belief, defendant Marc A. Bouchard ("Bouchard") is a citizen and resident of Canada and was a high-ranking officer or director of several of the Debtors during material times relevant to this action.

22.    Upon information and belief, defendant Serge Fortin ("Fortin") is a citizen and resident of Canada.  He served as an officer or director of several of the Debtors during material times relevant to this action.

23.    Upon information and belief, defendant Terence Jarman ("Jarman") is a dual citizen of Great Britain and Canada, and resides in Toronto, Canada.  Jarman was the Chief Executive Officer of, and/or a director of, several of the Debtors during material times relevant to this action.

24.    Upon information and belief, defendant Stewart Verge ("Verge") is a Canadian citizen and resides from time to time in Ponce Inlet, Florida.  Verge was a director or officer of several of the Debtors and was responsible for overseeing the construction of the GlobeSystem during material times relevant to this action.

25.    Boychuk, Bouchard, Fortin, Jarman, and Verge are collectively referred to hereinafter as the "Debtors' Directors and Officers."

*The TI Director and Officer Defendants*

26.    Upon information and belief, defendant Jean C. Monty ("Monty") is a Canadian citizen who resides at various times throughout the year in North Palm Beach, Florida.  Monty was the Chairman, President, and Chief Executive Officer of BCE and Chairman of TI between February 2000 and April 2002.

27.    Upon information and belief, defendant Richard Currie ("Currie") is a citizen and resident of Canada.  Currie served as a director of TI from December 2000 until April 2002.  During that period, Currie was also the "lead" director on BCE's board, meaning that Currie acted as Chairman when the BCE board met in executive session.  In April 2002, Currie succeeded Monty as Chairman of the Board of BCE, a position he currently holds.

28.     Upon information and belief, defendant Thomas E. Kierans ("Kierans") is a citizen and resident of Canada.  He was a member of BCE's board of directors while he served as a director of TI from December 2000 until April 2002.  Kierans, like Currie, was present when the BCE board met in executive session.

29.     Upon information and belief, defendant Stephen P. Skinner ("Skinner") is a citizen and resident of Canada.  He served as Vice President and Controller of TI from July 2001 to April 2002 while he was also the Corporate Controller of BCE.

30.     Upon information and belief, defendant H. Arnold Steinberg ("Steinberg") is a citizen and resident of Canada.  He was a director of TI during material times relevant to this action, and previously served as a director of Bell Canada International, Inc., a BCE subsidiary.

31.     Monty, Currie, Kierans, Skinner and Steinberg are collectively referred to hereinafter as the "TI Directors and Officers." Charts showing the various roles filled by Boychuk and the other individuals named as defendants herein are contained in Exhibit "A" annexed hereto and incorporated by reference herein.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### (Incorporating All Previous Allegations)

*TI Prior to the BCE Acquisition*

32.     By 1999, TI and its subsidiaries and affiliates owned or operated capacity on nearly every sub-sea fiber optic cable system and resold that capacity primarily on a wholesale basis.  Although TI was profitable as a result of its voice revenues, given the termination of its long distance monopoly by the Canadian government in October 1998, it projected declining revenues from that business segment.  Accordingly, it was searching for a new strategy to transform itself into a growth company.

33.    In May 1999, TI announced its intention to build the GlobeSystem.  When completed in 2004, the GlobeSystem would have allowed customers to connect with each other worldwide, regardless of their underlying network technology.

34.    In July 1999, TI raised $1 billion through the sale of debentures (the "Debentures").  TI was the obligor on the Debentures, with Debtor Teleglobe Holdings (U.S.) Corporation ("THUS") acting as guarantor.  THUS is the United States parent of the other Debtors (except for TPR and Teleglobe Luxembourg LLC).  A corporate chart of the Debtors is annexed hereto as Exhibit "B" and incorporated by reference herein.

35.    To obtain further financing for the GlobeSystem project, TI decided to search for a strategic investor.  BCE, which already held a 23% ownership stake in TI through Bell Canada, was a logical buyer.  Acquiring TI also was consistent with BCE's need to revitalize its own stagnant growth, and its purchase of TI also served to block competitors from gaining control of TI and entering the Canadian market.

*BCE's Desire to Grow Beyond Canada*

36.    In the late 1990s, BCE was struggling with the equity market's perception of BCE as a purely Canadian company, with very little – if not negative – growth potential.

37.    Although BCE is and was Canada's leading communications company, with interests in a wide range of communication products and services, its major holding was Bell Canada, which was, on information and belief, undervalued by the public markets.  Specifically, Bell Canada was viewed as a traditional local wired telephone provider, with little chance of expanding beyond Canadian borders.  In addition, because Canada had lifted Bell Canada's monopoly on local and regional telephone services, its market share was expected to erode. Thus, BCE was viewed as a stagnant, slowly declining enterprise.

38.     To change this view, BCE elected to make a series of investments.  BCE first raised $5.1 billion in June 1999 by selling 20% of Bell Canada's common stock to Ameritech (which subsequently merged with SBC Communications, Inc. ("SBC")).  BCE also spun off its interest in Nortel Networks Inc. ("Nortel"), thereby raising another $2.9 billion.  As a result of these transactions, BCE raised about $8 billion in cash to proceed with its investment strategy.  Its sale of a minority interest in Bell Canada was not necessarily final, however.  As part of that transaction, Ameritech was given a "put" right which, if exercised, would force BCE to repurchase the shares at a 25% premium to the then – prevailing market price of the stock.

39.     On February 15, 2000, BCE and TI executed an agreement (the "Acquisition Agreement") pursuant to which BCE would acquire all of the shares of TI that were not already owned by Bell Canada.  The Acquisition was a major strategic transaction for BCE.  At that time, Monty (then BCE's Chairman and CEO) publicly described BCE's strategy as follows: "The acquisition of Teleglobe provides BCE with a key asset to be an important international player in the Internet data communications service business."  Monty also said "BCE is willing to commit significant resources to building up of GlobeSystem – initially as much as $1 billion for the new venture – from an estimated $7 billion war chest…."

40.     Thus, from the moment the Acquisition was announced, the entire point of the Acquisition – from the perspective of both parties – was for BCE to provide the funding required to complete the GlobeSystem and to reap the resulting benefits of being, as Monty said, "an important international player in the Internet data communications service business."

41.     Moreover, there was little doubt that BCE would in fact be required to fund TI and the Debtors for some time.  At a meeting held on February 14, 2000, the day before the Acquisition Agreement was announced, TI's Chief Financial Officer reported that TI's profit

margins were "decreasing at levels never before experienced," that "important" capital expenditures were needed, and that financing would be "more challenging" in the future given that TI was close to being out of compliance with various financial covenants in its debt instruments.

*BCE Makes its Pre-Closing Commitment to GlobeSystem*

42.     When announcing the Acquisition Agreement, BCE made clear to the public debt and equity markets that BCE would provide the financial support necessary to complete the GlobeSystem.   Monty stated on February 15, 2000, "[a]s part of the BCE group of communications companies, Teleglobe's position will be strengthened and it will be better placed to realize its goal of becoming a global data/Internet company.  Teleglobe is already well under way with … GlobeSystem, which BCE will continue to support."

43.     By the spring of 2000 (several months after the Acquisition Agreement was announced but prior to its closing in November 2000 (the "Closing")), access to the public debt and equity markets became more difficult for telecom and internet companies.  At the same time, TI's financial performance was disappointing.  Notwithstanding deteriorating market conditions, BCE announced its resolve to close the Acquisition Agreement and complete the GlobeSystem project, and publicly ascribed TI's poor financial performance to macroeconomic factors.

44.     Consistent with BCE's long-term vision, shortly after the Acquisition Agreement was executed but prior to the Closing (the "Gap Period"), BCE requested that the TI board proceed expeditiously with the completion of the GlobeSystem project.  By that time, however, TI and the Debtors had exhausted most of the available funding under their existing bank facility (the "Existing Bank Facility") and had spent the proceeds of the Debentures.   Cash flow projections also were negative since, among other things, the Existing Bank Facility was coming

due in July 2000, requiring repayment of about $620 million.    Given prevailing market conditions, there was no other funding available to continue construction of the GlobeSystem project.

45.    During the Gap Period, TI's board of directors was still independent, since BCE only held a minority voting position on the board.    Thus, in May 2000, the TI board did not unconditionally grant BCE's request to continue building the GlobeSystem, but instead informed BCE that TI would cease construction unless BCE made a substantial funding commitment, in an unequivocal and irrevocable written form, to assure the TI board that sufficient funding would be made available to pay the ongoing construction expenses.

46.    In this regard, the minutes of the May 16, 2000 meeting of the Special Committee of the TI board state:

> The Committee was of the opinion that if the Corporation was to continue with the capital expenditure program and that such program could not realistically be funded out of the Corporation's available resources, then BCE should be asked to commit to the necessary funding.

47.    Before irrevocably committing to TI's request for funding during the Gap Period, BCE requested and received the right from TI to install BCE-affiliated high-level management at the Debtors even though the Acquisition had not yet closed.    BCE replaced Paolo Guidi as Chief Executive Officer of TCC with Jarman, who was then Vice Chairman of Bell Canada.    Jarman was charged with the responsibility of overseeing the entire TCC Group, which was building the GlobeSystem and incurring its substantial costs and expenses.

48.    BCE also removed Claude Seguin as TI's Chief Financial Officer and in his place appointed Boychuk, then Treasurer of BCE.    When Monty introduced Boychuk to the TI board he stated that Boychuk was "well positioned to manage the financial issues of Teleglobe over the

next few months, more particularly in light of the increased participation of BCE in the refinancing discussions."

49.      Further, BCE appointed (a) Verge, as President of Global Operations of TCC, (b) Bouchard, as President, North American Markets and Corporate Development of TCC, and (c) Fortin, as President of Global Markets of TCC.  By the summer of 2000, BCE had replaced no less than seven senior executives of TI and the Debtors – almost the entire top officer group. Likewise, Monty himself took over the Chairmanship of TI in February 2000, almost nine months before the Closing.

50.      Finally, BCE retained outside experts to assist with the assessment process and determined that a total of $6 billion would have to be committed to the GlobeSystem through 2004, at which time the project was expected to become cash flow positive and self-financing.

51.      TI's board minutes for June 18, 2000 reveal that BCE knew that there were insufficient funds to continue building the GlobeSystem without BCE funding:

> BCE advised Teleglobe that it believed that an adjustment [to the purchase price for the Acquisition] was appropriate in light of the fact that financial support from BCE would likely be required prior to closing of the transaction in order for Teleglobe to maintain, among other things, the timely development of the GlobeSystem program.  BCE's position was that financial support of this nature was not contemplated by the [Acquisition] Agreement.

52.      The minutes of that meeting also state that during the discussions with BCE the "Independent Committee [of the TI board] determined to continue negotiations with BCE provided that certain minimum terms and conditions would be agreed to by BCE, including … the provision of any financial assistance required by Teleglobe prior to the closing of the transaction."

53.      During the Gap Period, BCE considered and adopted a four-part financing plan to obtain the $6 billion needed to fund the GlobeSystem through completion and start-up.  First,

14

BCE would agree to the demand by the Independent Committee of the TI board to fund the Debtors' needs through Closing.  Second, BCE would deliver to the lenders under the Existing Bank Facility a support letter in which it irrevocably would agree to fund GlobeSystem costs up to $1 billion through the end of June 2001 to induce them to refinance the Existing Bank Facility and increase its size from $750 million to $1.25 billion.  Third, BCE would induce suppliers and other trade creditors to extend favorable credit terms by making public statements of unequivocal support for the GlobeSystem.  Finally, BCE would cause TI to access the public debt markets for an additional $2.3 billion when conditions warranted.

54.    After BCE disclosed its funding plan to the TI board, the Acquisition Agreement was amended (the "Amendment").  BCE now was obligated to fund all obligations of TI and its operating division, the TCC Group, through the Closing.  The Amendment provided:

> BCE agrees irrevocably to provide any financial assistance required by the Company on or prior to the Closing of the Acquisition with respect to all of the Company's spending needs or to agree to reduce such needs upon the reasonable [request] of the board of directors of the Company (whether or not the BCE nominees to the Board of Directors have voted against the making of such request).  For greater certainty, any breach of the Company's covenants under its existing debt obligations shall not entitle BCE to terminate the [Acquisition] Agreement.

55.    With that commitment in place, BCE convinced TI's lenders to replace the Existing Bank Facility with a new facility (the "New Bank Facility") and increase the total borrowings to $1.25 billion.  This New Bank Facility, which was due and payable on July 23, 2001, resulted in approximately $500 million of new, additional credit availability for the GlobeSystem.  THUS was either the obligor or guarantor of the entire New Bank Facility.

56.    With the BCE funding commitment in place and the Existing Bank Facility replaced by the New Bank Facility, TI and the Debtors carried out BCE's mandate to continue to build the GlobeSystem.

*BCE's Long Term Support of the GlobeSystem is Reconfirmed*

57.    On August 9, 2000, Boychuk, who then was BCE's Treasurer and TI's CFO, reported that TI had negative EBITDA of approximately $28 million for the second quarter of 2000.

58.    During public meetings held on August 9, 2000 specifically to discuss TI's second quarter 2000 results, Monty, in Boychuk's presence, stated:

> Let me say at the outset that although it will take a little longer then we had originally anticipated to turn around Teleglobe, BCE is totally committed to the strategic value of this acquisition.  We believe that the investment we are making in the company will build a stronger Teleglobe with even greater prospects for growth and consequently greater value to our shareholders and to BCE strategic intent.…
>
> BCE has the resources to take the challenge [of Teleglobe] on and succeed….  BCE's consolidated EBITDA is moving towards the eight billion dollar level….  Our business face can withstand the short term rebuilding of Teleglobe.
>
> Teleglobe's contribution to BCE's growth in the coming two to three years will be material, attractive and in line with the value we have invested to conclude the transaction.  So in conclusion we have the management team, the financial resources and the proper strategic intent to succeed.

*The Acquisition Closes and BCE Takes Complete Control Over TI and the Debtors*

59.    After the Closing on November 1, 2000, BCE completed the replacement of the independent directors of TI and the Debtors with its own designees, and BCE assumed total control of its new investment.  The new board configurations of TI and the Debtors effectuated by BCE are set forth in Exhibit "C" and incorporated herein by reference.

60.    BCE also continued to install BCE–affiliated operating management at various key positions in the TCC Group, in addition to those installed during the Gap Period, to control all treasury and merger and acquisition functions, as well as network operations.

16

61.     The principal control people installed by BCE after the Closing or whose Gap Period appointments were ratified are as follows:

62.     *Michael Boychuk*

(a)     Boychuk was appointed TI's Chief Financial Officer and Executive Vice President – Finance on May 31, 2000, positions that he maintained through April 23, 2002, the day before BCE publicly announced that it would cease funding the Debtors.

(b)     On or before November 1, 2000, BCE caused Boychuk to become and remain through April 23, 2002 (1) a director of THUS, Teleglobe Holding Corp. ("THC"), Teleglobe Marine (U.S.) Inc. ("TMI"), Teleglobe Submarine, Inc. ("TSI") and Teleglobe Investment Corp. ("TIC"); (2) President and Treasurer of THUS, THC and TIC; and (3) President and Chief Executive Officer of TMI and TSI.

(c)     Boychuk was not an independent director or officer of the Debtors. Boychuk's principal loyalties were to BCE.  On or about January 17, 2001, Boychuk became (and he remained at all relevant times) BCE's Treasurer and Bell Canada's Vice President and Treasurer.  Upon information and belief, Boychuk's compensation was at all times determined by BCE and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Boychuk's personal lifestyle.

63.     *Marc Bouchard*

(a)     On or about May 17, 2000, Bouchard became President, North American Markets & Corporate Development at TCC.  On August 1, 2000, Bouchard became, and remained through at least January 23, 2002, a director of OTI, TPR, TUSA, THUS, THC and TIC.  Bouchard also was TUSA's Executive Vice President and President-North

17

American Markets & Corporate Development during the period August 1, 2001 through February 25, 2002. Prior to joining the Debtors, Bouchard was the President and CEO of Bell Nexxia, another BCE subsidiary.

(b)     Bouchard was not an independent director or officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Bouchard's lifestyle.

64.     Boychuk and Bouchard constituted the entire boards of directors of THUS, THC and TIC between November 1, 2000 and January 23, 2002.

65.     *Terence Jarman*

(a)     Prior to May 2000, Jarman was the Vice Chair of Bell Canada and President of Bell Nexxia. At that time he was tapped by BCE to run TI, TCC and TUSA as their President and Chief Executive Officer and continued in those positions through January 23, 2002. Jarman also served as a director of TI between December 2000 and January 23, 2002.

(b)     Jarman was not an independent officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $600,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Jarman's lifestyle.

18

66.   *Serge Fortin*

(a)     Fortin was President of Bell Acti Media, a BCE indirect subsidiary, until May 2000, at which time he became TCC's President, Global Markets.  BCE caused him to serve as a director of TCC, TUSA and OTI from August 1, 2000 through February 16, 2002.  He also served as a director of THUS, THC, TIC, TMI, TPR, TSI and Teleglobe Telecom Corp. ("TTC") in May 2002, upon information and belief in order to influence how these Debtors were to be liquidated in a manner consistent with BCE's best interests.

(b)     Fortin was not an independent officer or director of the Debtors.  His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Fortin's lifestyle.

67.   *Stewart Verge*

(a)     Verge was a director and officer of TCC and TUSA from August 2000 until January 2002.  Upon information and belief, as President – Global Operations, and later Executive Vice President of TCC and TUSA, Verge was responsible for overseeing the construction of the GlobeSystem.  He also served as an officer and director of OTI between August 2000 and March 2002, and as a director of TPR beginning in August 2001.  Verge began his career in telecommunications with Bell Canada in 1973.  He was appointed Group Vice President at Bell Ontario in 1991, and was Vice President-Networks at Bell Canada in 1992.

(b)     Verge was not an independent officer or director of the Debtors.  His compensation during all relevant times was determined by BCE, and included a salary

and perquisites in excess of $300,000/year, as well as participation in BCE's stock option

program and pension plan, all of which, upon information and belief, were material to

Verge's lifestyle.

*BCE and the TI Directors and Officers Exercise Control Over the Debtors, and the Debtors'*
*Directors and Officers Abdicate Their Responsibilities*

68.     BCE's purpose in purchasing that portion of TI that it did not already own is not

in dispute.  As BCE advised TI's public shareholders in the Management Information Circular

circulated in connection with the Acquisition, BCE rejected alternatives to owning all of TI and

the Debtors because such alternatives "would have made it more difficult for BCE to be *in full*

*control* of the evolution and development of Teleglobe as a global expansion tool" (emphasis

supplied).

69.     Through (among other things) its appointment of key officers and directors to

positions on the boards of TI and the Debtors, BCE – and the TI Directors and Officers at the

behest of BCE – exercised actual control over the Debtors for the sole benefit of BCE.

70.     For example, in January 2002, prior to the time that BCE withdrew its financial

support for the GlobeSystem, BCE caused TI, which held the registered name and mark

"Teleglobe" on behalf of all the Debtors, to assign all of its registered U.S. and Canadian

trademarks to BCE for consideration of $1.  Defendant Boychuk signed several of the

assignments on behalf of TI.  Although the transaction was reversed after the Chapter 11 Cases

were commenced when the Debtors' management discovered what had happened, the fact that

BCE did, in fact, strip the TI entities of their valuable trademark rights for no consideration is a

clear example of an actual exercise of control over these entities.

71.     Another clear example of the exercise of actual control by BCE of TI and the

Debtors is the issuance and then redemption of the Fifth Series Preferred Shares, described

herein.  As alleged in greater detail below, BCE caused TI to utilize TI's tax losses to shelter a BCE tax gain on the shares of Nortel Networks owned by BCE, at a tax savings to BCE of approximately $50 million.  BCE paid nothing to TI for the use of these tax losses, even though BCE derived tens of millions of dollars of benefit from the utilization of this very asset.

72.    BCE's actual control over TI and the Debtors extended not only to attempts to strip away intellectual property and utilization of tax losses for no consideration, but BCE went so far as to force TI and the Debtors to purchase software of another BCE affiliate, BCE Emergis, for approximately $7 million.  TI and the Debtors did not need or use this software – indeed, TUSA spent Cdn$5 million on software that it never even removed from the boxes – and the transaction eventually was unwound after the Chapter 11 Cases were commenced, but not before BCE had enjoyed the benefit of higher revenues in its software unit as a result of this exercise of actual control over TI and the Debtors.

73.    In a similar vein, when BCE determined to sell the holdings in the Excel Companies principally owned by TTC to VarTec, not only did BCE exclusively negotiate the entire transaction, but negotiated for itself, not for TTC, the right to a board seat on the VarTec board of directors as well as a warrant for VarTec common stock.  Further, BCE forced THUS to forgive intra-company debts due from Excel and to make VarTec TUSA's exclusive carrier for domestic termination of calls for a three year period, even though TUSA was not a party to the sale agreement with VarTec and did not receive any consideration for doing so.

74.    Perhaps most importantly, after taking control of TI and the Debtors, BCE took control of all central corporate functions, such as treasury, investor relations, and public securities reporting – all functions that previously resided at TI or the Debtors.  When BCE determined to terminate its funding, therefore, it did so knowing that the Debtors lacked

independent managerial talent, since BCE had transferred or fired virtually all of the Debtors' senior officers.

75.     Through these and numerous other non-arm's length transactions, BCE and the TI Directors and Officers exercised actual control over the Debtors and their property.

76.     While BCE and the TI Directors and Officers assumed and exercised control over the Debtors, each of the Debtors' Directors and Officers breached his fiduciary duties to the Debtors by abdicating his responsibilities with respect to the business and operations of the Debtors, including the funding and continuing build out of the GlobeSystem.  For example, the Debtors' corporate minute books reveal that from November 1, 2000, the day BCE took <u>de jure</u> control of the Debtors, through April 24, 2002, the day BCE announced that it would cease its funding, there was only one actual meeting of the board of directors of only one Debtor, with all other board action taken by written resolution.  None of those perfunctory resolutions reveal that the Debtors' boards ever investigated, analyzed, or considered the significant issues confronting the Debtors during this period.

*The Debtors' Directors and Officers and the TI Directors and Officers Fail to Consider Other Options*

77.     On November 1, 2000, the date of the Closing, BCE's written commitment contained in the Amendment to fund all of TI's spending needs expired.  However, the need for such funding did not disappear with the Closing.  As the TI board had recognized several months earlier, the completion of the GlobeSystem project was dependent upon continued funding from BCE – especially after BCE had directed the full draw down of the bank lines available to TI and the Debtors.

78.     Nevertheless, the Debtors' Directors and Officers and the TI Directors and Officers continued to cause the Debtors to build the GlobeSystem and incur indebtedness

22

without obtaining an unequivocal written commitment by BCE to see the project through financially. Moreover, no options other than continuing the build out were ever explored even though the TI and BCE boards had become fully aware that BCE was the only available financing source and BCE had reservations about continuing to fund the project.

79.     In a January 24, 2001 presentation to TI's new BCE–controlled board, it was reported that more than $4.33 billion would be required to continue building the GlobeSystem in the years 2001 through 2003 – approximately $3 billion for TCC Group's capital expenditures for network build out and the balance to satisfy operating cash flow deficiencies. More than $682 million in additional funds would be needed in 2001 even after TI and the Debtors fully drew down both the New Bank Facility and the $1 billion previously committed by BCE. The financing plan presentation revealed, however, that, "given current market conditions, … Teleglobe would have difficulty accessing the capital markets this year" and that "[a]ny cash needs in excess of the [New Bank Facility] for 2001 will likely need to be funded by BCE."

80.     To make matters worse, since the New Bank Facility would mature in July 2001 if it could not be refinanced or extended, TI and THUS potentially would require $1.25 billion to repay the New Bank Facility in addition to the $682 million needed to continue the GlobeSystem.

81.     As of November 1, 2000, the Debtors were insolvent or in the zone of insolvency. The Debtors' obligations were mounting, their cash flow was deteriorating, and there was a clear and growing risk that the Debtors' creditors would not be paid – all factors that would have caused any reasonable person who owed fiduciary duties to the Debtors to recognize that the interests of the Debtors' creditors were part of the community of interests that had to be considered. TI's consolidated balance sheet for the period ending December 31, 2000 showed

$7.7 billion of total assets, but $5.1 billion of that sum was assigned to goodwill, and the Debtors' assets lacked liquidity.  More than $1.8 billion of debt was due to creditors within one year and, as the January 24, 2001 budget showed, the GlobeSystem had a projected cash flow shortfall of $682 million through the end of 2001 with additional financial support required thereafter.  If this indebtedness could not be refinanced or extended or if the cash flow deficits for 2001 were not covered, the Debtors would be unable to pay their debts as they became due.

82.    TI's financial performance was not improving and the ability of telecom and internet companies to borrow money was getting worse by the day.  Based upon then-current projections, in order to discharge their fiduciary duties to the Debtors, the Debtors' Directors and Officers, and the TI Directors and Officers who assumed control of, and fiduciary duties to, the Debtors, either had to (a) obtain the unequivocal commitment of BCE to fund the GlobeSystem, requiring at least $2.9 billion through 2003 ($4.3 billion less $1.4 billion available under the New Bank Facility and BCE's original $1 billion commitment), plus another $1.25 billion to repay the New Bank Facility if it could not be refinanced in July 2001, or (b) at least develop contingency plans in the event there was insufficient funding from BCE to complete the GlobeSystem.

83.    In violation of their fiduciary duties to consider the best interests of the Debtors' entire body of stakeholders, including their creditors, the Debtors' Directors and Officers, and the TI Directors and Officers who assumed control of, and fiduciary duties to, the Debtors, never performed any independent analysis to determine what was in the Debtors' creditors – not BCE's – best interests.  Instead, they made no decisions, took no actions, and abdicated their duties and followed BCE's directions without question or comment.  As a January 24, 2001 presentation to the TI board confirms, "[a]ll financing and Corporate functions, including reporting, have been integrated within BCE."

24

*BCE's Additional $2.5 Billion Commitment*

84.    Three TI directors who also were BCE board members – Monty, Currie and Kierans – attended the January 24, 2001 TI board meeting (these three directors, in addition to Jarman and Steinberg, comprised the entire TI board of directors).  Upon information and belief, upon hearing that TI and the Debtors required BCE to fund $2.9 billion through 2003 (in addition to the $900 million balance still available under BCE's previous commitment of $1 billion), some or all of these joint BCE/TI board members became increasingly concerned that BCE would not provide that level of funding.  These concerns should have, but did not, cause the Debtors' Directors and Officers (and the TI Directors and Officers, who had assumed fiduciary duties to the Debtors) to at least consider options other than continuing to build the GlobeSystem.

85.    Upon information and belief, that same day, there was considerable discussion at a subsequent BCE board meeting among the same individuals concerning the financial assistance that TI and the Debtors would need and whether BCE truly was willing to provide it (as BCE publicly was declaring at the time).  After discussion, the BCE board agreed merely to eliminate a pre-existing restriction in the then-existing $1 billion commitment relating to the period of time during which such commitment could be drawn.  No further funding was authorized.  Upon information and belief, at this same BCE board meeting, the BCE board directed that ways be found to minimize BCE's risk regarding the GlobeSystem by reducing the Debtors' cash needs to a level that BCE was willing to support.

86.    Upon information and belief, this direction resulted in a revised GlobeSystem budget being presented to the TI board on February 28, 2001 by the TCC Group (the "Revised TCC Budget") reducing the amount of projected additional support by BCE to $2.5 billion from

25

the $2.9 billion presented just one month earlier.  In all events, approval and funding of even this Revised TCC Budget would still require an additional $2.5 billion from BCE over and above the $1 billion previously committed by BCE.

87.    The TI board, which included Monty and Currie, approved the Revised TCC Budget.  Upon information and belief, Monty and Currie would not have approved a Revised TCC Budget requiring $2.5 billion in additional support over and above the previously committed $1 billion absent approval of BCE.  As was previously noted, Monty chaired the BCE board and Currie was the BCE "lead" director.

88.    When the Revised TCC Budget was approved, the Debtors' Directors and Officers did not express any concerns as to BCE's willingness to fund the Revised TCC Budget. If BCE had conditioned the funding on some basis, then such conditions should have been articulated by Monty and Currie to TI and the Debtors.  Any such conditions presumably would have triggered a discussion as to whether the Debtors should continue with the GlobeSystem, or explore other options.  Since no such discussions were noted or explored, the only reasonable inference is that BCE had committed to fund an additional $2.5 billion over and above the $1 billion previously committed.

89.    When BCE committed to fund the GlobeSystem, that commitment was made both to TI and to the Debtors.  The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem, and the Debtors incurred substantial liabilities carrying out BCE's mandate.  Moreover, the November 28, 2001 BCE board resolution authorizing the $850 million commitment (see paragraph 106 below) specifically provided for investment in and financial assistance to TI or any subsidiary thereof.  The Debtors were direct parties to the

funding agreements with BCE or, at a minimum, the Debtors were intended third party beneficiaries for whose benefit BCE's commitments were made.

*The TI Board Takes Further Action Consistent With The Existence Of A BCE Commitment*

90.    The TI Directors and Officers' actions were consistent with the existence of an unequivocal commitment by BCE to fund a total of $2.5 billion through 2003 above the $900 million still available under BCE's original $1 billion commitment.  Support for this position is evidenced by the passage of two proposals at the February 28, 2001 TI board meeting.

*The Redemption of the Third Series Preferred Shares*

91.    In advance of the February 28, 2001 meeting, the TI directors (including Monty, Currie and Kierans) received a Purpose and Summary Statement regarding the proposed redemption of TI's Third Series Preferred Shares.   Among other things, the Purpose and Summary Statement contained the following information for the directors:

     (a)    the total cost of the redemption of the Third Series Preferred Shares was approximately $126.1 million; and

     (b)    the redemption of the Third Series Preferred Shares was taken into account in TI's business plan and Revised TCC Budget requiring BCE to fund the $3.4 billion (inclusive of the remaining $900 million still available under BCE's original $1 billion commitment).

92.    The resolution was supported by a Solvency Certificate dated February 28, 2001, prepared by Boychuk, who, as alleged above, was then TI's CFO, BCE's Treasurer, and a director and officer of several of the Debtors.  Boychuk attended the February 28, 2001 TI board meeting as an invited guest, and he was available to answer questions and comment upon the propriety of the proposed redemption.  Also in attendance were defendants Bouchard and Verge, who, as noted, were directors of several of the Debtors.

93.    Boychuk's Solvency Certificate read as follows:

27

I, the undersigned, being the Executive Vice President, Finance and Chief Financial Officer of Teleglobe Inc. ("Teleglobe") hereby certify as follows:

1. I am familiar with the financial affairs of Teleglobe generally, including its assets, liabilities and stated capital as shown in its balance sheet for the year ended December 31, 2000.

2. I am aware of the redemption on April 2, 2001 of all of the 5,000,000 Third Series Preferred Shares of Teleglobe currently outstanding at a price of $25 per share, together with an amount equal to $0.2219 per share representing all preferential dividends payable thereon.

3. After making reasonable inquiries, I have no reasonable grounds for believing that, for the purposes of Section 36 of the Canada Business Corporations Act:

   (a) Teleglobe is, and following the redemption, will be unable to pay its liabilities as they become due; or

   (b) following the redemption, the realizable value of the assets of Teleglobe will be less than the aggregate of its liabilities and the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the Third Series Preferred Shares.

94.    Implicit in these statements was an acknowledgement that BCE had committed to provide the $3.4 billion required to fund the Revised TCC Budget since, without such a commitment, TI would have been "unable to pay its liabilities as they became due." Indeed, the Revised TCC Budget showed that there was going to be a cash flow funding deficit in 2001 of more than $214 million, even assuming that the New Bank Facility in the amount of $1.25 billion coming due in July 2001 could be refinanced or extended. Since the Revised TCC Budget required $3.4 billion of BCE support and the Revised TCC Budget had been approved contemporaneously with the issuance of the Solvency Certificate, either (a) BCE had committed

to provide a total of $3.4 billion in support to the GlobeSystem project, or (b) the Solvency Certificate was inaccurate and the best interests of creditors had to be taken into consideration.

*The Fifth Series Preferred Shares*

95.     The second item approved at the February 28, 2001 TI board meeting involved a transaction whereby BCE transferred to TI Nortel shares with a market value in excess of $500 million in exchange for an allocation of Fifth Series Preferred shares to be issued by TI. After the transfer, TI was directed by BCE to sell the Nortel shares, retract the Fifth Series Preferred shares and repay BCE the value of the Nortel shares.  Upon information and belief, BCE's board only could have approved the Nortel share transaction if it believed that TI was solvent and able to pay its debts as they became due.  TI only could be solvent if BCE had committed $3.4 billion in funding.

96.     Moreover, this transaction was undertaken to utilize tax credits that were not otherwise available to BCE.  Although it used TI to shelter $50 million of actual tax exposure, BCE did not pay TI anything for this valuable accommodation, nor did the TI Directors and Officers demand reimbursement for the use of these valuable assets.

*BCE's Support for GlobeSystem Wanes*

97.     Upon information and belief, while publicly declaring unwavering support for the GlobeSystem in early summer of 2001, BCE already had moved toward a formal decision to cease funding TI and the Debtors.

98.     In its Management Discussion and Analysis for the year ended December 31, 2000 (which was released to the public on April 24, 2001, less than two months after BCE committed to provide $3.4 billion of financing), TI stated as follows:

> Management considers that it has sufficient sources of funds from operating activities, unused portions of existing credit facilities, financial support from BCE and access to capital markets to meet

> its working capital and capital investment requirements, debt
> repayments and other obligations in 2001 and future years
> although, without financial support from BCE, the Corporation
> [TI] would need to re-evaluate its planned capital expenditures
> and/or seek other sources of financing.

99.     The day after that statement was released, Monty publicly stated that BCE was ready to finance the GlobeSystem's capital requirements in 2001 and put BCE's full resources behind TI and the Debtors.  During an equity analysts conference call on April 25, 2001 to discuss BCE's quarterly results, the following dialogue took place:

> Q.     By Richard Talbot of RBC Dominion Securities
>
> "I'm wondering to what extent BCE is prepared to fund
> that [Teleglobe GlobeSystem CAPEX] commitment."
>
> A.     By Jean Monty
>
> "[T]here is no question that we are ready to finance the
> Teleglobe program….  We will put our resources behind
> the Teleglobe program … we didn't come into this business
> for one or two year payback.  We really fully realized all
> along that this was a long-term payback business."
>
> Q.     By Dvai Ghose of CIBC World Markets
>
> "[O]n a related point with the financing of Teleglobe Jean,
> are you committed that, should you not be able to find
> partners to help with the financing, to fund the full, 5
> billion of CAPEX on a going forward basis…."
>
> A.     By Jean Monty
>
> "[L]et me reiterate, the capital program is 3.4 not 5 billion
> [reflecting the reduction directed by the BCE board after
> the January 24, 2001 board meeting].  … [W]e are
> committed to help Teleglobe finance the whole thing.  So
> there is no quivering about that, there's no
> misunderstanding I hope between all of us, we'll get it
> done…."

100.     By mid-summer 2001, certain lenders under the New Bank Facility requested further confirmation of BCE's continuing commitment to fund the GlobeSystem.  In separate

letters dated July 12 and July 13, 2001 responding to the lenders' requests, Pierre Van Gheluwe, Bell Canada's Director – Banking, and Siim Vanaselja, Bell Canada's Chief Financial Officer, both reiterated BCE's commitment to GlobeSystem by attaching to the letters transcripts of the April 25, 2001 conference call quoted above.

101.    However, upon information and belief, BCE's internal commitment to the GlobeSystem project had started to wane during the summer of 2001.  TI's July 13, 2001 Summary Performance Review includes a section entitled "BCE LIQUIDITY OUTLOOK." This liquidity outlook demonstrates that while BCE's high-ranking officers were reaffirming BCE's commitment to the GlobeSystem and accordingly causing the Debtors to incur substantial additional liabilities that they had no way to repay absent BCE's support, BCE had concluded that TI's funding shortfalls created stress on BCE's liquidity outlook.  Among other things, the liquidity outlook indicates that:

- Without significant adjustments to TCC requested funding from BCE, BCE will:
  - o  Exhaust its own credit facilities;
  - o  Deteriorate its own consolidated and non-consolidated credit ratios;
  - o  Suffer a ratings downgrade thereby increasing its own debt service costs and possibly reducing access to the capital markets; and
  - o  Have to raise equity at an inopportune time, resulting in earnings dilution.
- TCC has to trim its 2002 CAPEX by much more and achieve network and growth objectives with far less BCE funding;
- There are other BCE investments that will require substantial funding by BCE; and
- SBC's "put" right to sell back Bell Canada shares directly to BCE at a 25% premium, at a cost of $7-8 billion, was coming due in July 2002.

102.    Nevertheless, in late June 2001, BCE made several specific representations to the lenders under the New Bank Facility that were consistent with its public expressions of support and that induced them to extend the New Bank Facility to July 2002.

103.    For example, upon information and belief, in late June 2001, BCE sent information to the lenders in which it represented that its $1 billion original commitment would not be fully exhausted until the first quarter of 2002.  That representation was not consistent with the existing cash flow analyses done by TI or BCE at that time.  Indeed, TI's July 13, 2001 Summary Financial & Performance Review reported that based upon TI's cash requirements, remaining BCE committed funding of $526M (under the $1 billion commitment) would be exhausted by the third week in September.  These internal projections concluded that BCE would be required to fund $432 million over and above its prior $1 billion commitment during the October through December 2001 time period alone.  This was more than double the projected funding shortfall of $214 million contained in the Revised TCC Budget.  Accordingly, the shortfall had grown by the time the lenders were induced to extend the New Bank Facility for another year.

*By November 2001, TI and the Debtors are Almost Out of Cash and They Begin to Draw Down on the Additional $2.5 Billion Commitment*

104.    On October 24, 2001, TI's board formally decided to draw down $75 million of the additional $2.5 billion committed by BCE on February 28, 2001.  BCE's board authorized the $75 million advance on that same day.  By this time, Teleglobe's New Bank Facility was completely drawn down so the only source of funds left to TI and the Debtors was BCE.

105.    TI's board of directors reconvened on November 28, 2001 because that additional $75 million advance had been exhausted and TI and the Debtors needed as much as $828 million more to pay for the remainder of TI's and the Debtors' 2001 and 2002 business plans.  On that

same day, BCE's board of directors approved TI's business and financial plan and budget for

2002 and authorized BCE to provide $850 million to TI and its subsidiaries (including the

Debtors), approximately $350 million of which was to be spent in December 2001.

106.     Resolution No. 7 adopted by the BCE board on November 28, 2001 provides, in

part:

> THAT, the Corporation be and it is hereby authorized, from time
> to time on or prior to December 31, 2002, to make investments in
> and to provide financial assistance to Teleglobe Inc. <u>or any
> subsidiary thereof</u> ("Teleglobe") (including investments to fund
> debt service pertaining to Excel Communications, Inc.) or to Bell
> Expressvu Limited Partnership or any subsidiary thereof
> ("Expressvu") in amounts not to exceed in the aggregate U.S. $850
> million in the case of Teleglobe and $400 million in the case of
> Expressvu (the "Additional Financial Assistance"), the whole as
> set forth below:
>
> > (a)     such Additional Financial Assistance may be made
> > by way of acquisition of debt securities, share or
> > partnership units, loans, guarantees, indemnities or
> > any combination of the foregoing, for general
> > corporate purposes including for purposes
> > contemplated by the Budget;
> >
> > (b)     the Corporation be and it is hereby authorized to
> > provide the Additional Financial Assistance directly
> > or through one or more subsidiaries;
> >
> > (c)     if Additional Financial Assistance is provided
> > through a subsidiary or subsidiaries, the
> > Corporation be and it is hereby authorized to
> > purchase shares or debt securities of, to make a loan
> > to or otherwise to provide financial assistance to the
> > said subsidiary or subsidiaries to enable the said
> > subsidiary or subsidiaries to provide the Additional
> > Financial Assistance to Teleglobe or Expressvu; and
> >
> > (d)     all advances of funds hereunder shall be at such
> > time and upon such terms and conditions as the
> > Chairman and Chief Executive Officer of the
> > Corporation (or any officer designated by such
> > person) may in his/her discretion determine.

33

(Emphasis supplied).  Once again, although BCE unequivocally authorized the $850 million advance to TI and the Debtors, the Debtors' Directors and Officers and the TI Directors and Officers failed to cause BCE's additional commitment to be reduced to a comprehensive written agreement as the independent TI board had required in the summer of 2000.  The failure to obtain this type of conclusive commitment was even more egregious in the face of known BCE reservations regarding continued financial support.  The failure to obtain a written agreement that unequivocally and irrevocably obligated BCE to provide the funding necessary for the Debtors' survival constituted a breach of fiduciary duties by the Debtors' Directors and Officers and the TI Directors and Officers, who were in a position of hopeless conflict between their loyalties to the Debtors and to BCE, for all practical purposes their real employer, and whose interests were paramount.

107.    Notwithstanding these breaches of fiduciary duty, a binding commitment was made, as evidenced by, among other things, BCE's own board minutes approving the $850 million allocation and various reported public statements that admitted this fact, and by the Debtors' reliance on BCE's commitment.

108.    Following the adoption of the funding resolution, Monty stated the following at a December 12, 2001 analysts meeting:

> We will have a requirement, 500 million dollars to inject new money into BC – excuse me, into Teleglobe in 2002.  It's not 2 billion or 2 ½ billion dollars, as some people have written, but we will have to put some money in the fourth quarter this year, probably about 500 million dollars, over and above the 900 million dollars US that we had talked about.…  We're talking about 500 this year in the fourth quarter and 500 next year, and 0 thereafter.

109.    These statements by Monty were well-publicized, as a Merrill Lynch & Co. Global Securities Research & Economics Group, High Grade Credit Research Report dated January 18, 2002 stated that "BCE at their analysts meeting in December 2001 reiterated its view

that TGO is a long-term strategic operation and <u>committed an additional C$1 bn to finance the completion of TGO's GlobeSystem buildout</u>" (emphasis added).

*BCE's Attempt to Rewrite History and Turn the $850 Million Commitment Into an Unenforceable "Intention"*

110.    In representation letters dated January 23, 2002 and February 27, 2002 that were provided to Deloitte & Touche LLP ("D&T") in connection with its audit of BCE's and TI's 2001 financial statements, TI stated as follows: "In addition, at the CEO conference held December 12, 2001, BCE <u>committed to contribute up to an additional Cdn$1.0 billion to support the working capital and debt repayment requirements of the Company over the next twelve months</u>" (emphasis added).   These letters, which were not labeled as drafts, were signed by Messrs. Monty, Boychuk and Skinner (all of whom at the time were senior officers and directors of the Debtors, TI and/or BCE).   Skinner explained to Monty that this sentence in the representation letters was necessary because D&T expressed concern over the cash flow situation at TI and asked for representations relating to BCE's financial support of TI.   According to D&T, in the absence of such representations, TI financial statements could require a going concern note.

111.    On March 5, 2002, Siim Vanaselja, BCE's Chief Financial Officer, while explaining that BCE would not formally guaranty the New Bank Facility, reiterated to the public that BCE made a Cdn$1 billion commitment (in addition to the earlier $1 billion commitment) and "with that incremental one billion Canadian, we should be able to bring Teleglobe to a free cash flow position in 2003."

112.    Some time prior to April 8, 2002, BCE changed its mind regarding the additional $850 million funding commitment.   On or about April 8, 2002, BCE negotiated changes to the previously provided representation letters with D&T.   On April 8, 2002, the same day that BCE

35

first announced that it would reevaluate its strategic options regarding the TI companies, BCE and D&T agreed to make changes to the representation letters in order to make it appear that BCE's $850 million (Cdn$1 billion) funding obligation was contingent, rather than firm.   The underlined language on the right represents the changes made by BCE:

| Original Section | Revised Section |
| --- | --- |
| In addition, at the CEO conference held December 12, 2001, BCE committed to contribute up to an additional Cdn$1.0 billion to support the working capital and debt repayment requirements of the Company over the next twelve months. | In addition, at the CEO conference held December 12, 2001, BCE announced its intention to contribute up to an additional Cdn$1.0 billion to support the working capital and debt service requirements of the Company over the next twelve months on the basis that with such support the Company will be able to meet its current business plan. <br><br> BCE Inc. is not obliged to provide such funding and BCE Inc.'s future funding decisions will be based on the facts and circumstances prevailing at such time. |

113.    Similar changes were made by or at the direction of BCE to TI's 2001 Financial Information report, which was originally approved by TI's board on February 28, 2002.   Under the heading "Financing Activities," the language underlined in the following passage was added:

> Given that the Corporation's credit facilities are currently fully drawn and that the Corporation is currently generating negative operating cash flows ($39 million in 2001), it relies on BCE, Inc. to provide it additional funding in order to meet its obligations although BCE is not obligated to provide such funding.   The Corporation's obligations consist of capital expenditures (including, but not limited to, approximately $300 million in 2002 to complete the GlobeSystem network) and the financing of negative operating cash flows which are expected to be significant. On December 12, 2001, BCE Inc. indicated its intention to contribute up to an additional CDN $1 billion to support BCE Teleglobe's working capital and debt service requirements over the next twelve months on the basis that with such support BCE Teleglobe will be able to meet its current business plan.   However, any funding decisions by BCE Inc. will be based on the facts and circumstances prevailing at the relevant time.   The Corporation's

> management <u>currently</u> expects that it will be able to renegotiate the
> extension of the credit facilities that mature in July 2002….

Under the heading "Liquidity, Indebtedness and Dependence on Additional Financing from BCE Inc.," the following underlined language was inserted:   "The Teleglobe Inc. group currently relies on BCE Inc. to provide funding in order to meet its obligations <u>although BCE Inc. is not obligated to provide such funding</u>."   In addition, one section was renamed and substantially revised:

| Original Section | Revised Section |
|---|---|
| **CONTROL BY BCE INC.** | **PARENT COMPANY** |
| BCE Inc. and its affiliates own all of the outstanding common shares of the Corporation and, subject only to applicable law and the terms of the Teleglobe Inc. group's financial instruments, exercise control over and manage the affairs and operations of the Teleglobe Inc. group. | BCE Inc. and its affiliates own all of the outstanding common shares of the Corporation and, subject only to applicable law and the terms of the Teleglobe Inc. group's financial instruments, has the power to exercise control over and to manage the affairs and operations of the Teleglobe Inc. group. |
| In particular, all of the officers of the Corporation are also BCE Inc. employees, most of BCE Teleglobe's senior management is comprised of former employees of BCE Inc. or its affiliates and all but one of the members of the Board of Directors of the Corporation are also members of the Board of Directors of BCE Inc. | Through other affiliates, BCE Inc. owns telecommunications assets which can be used to compete with the Teleglobe Inc. group and the interests of any such affiliates may be in conflict with those of the Teleglobe Inc. group. |
| Through other affiliates, BCE Inc. owns telecommunications assets which can be used to compete with the Teleglobe Inc. group and the interests of any such affiliates may be in conflict with those of the Teleglobe Inc. group. | |

BCE changed this section by deleting the statement that it "exercise[d] control over and manage[d] the affairs and operations of the Teleglobe Inc. group," because BCE knew that it

would be admitting publicly that it owed fiduciary duties to each member of the group, including the Debtors.

114.    BCE had decided to cease financing the Debtors and was trying to retreat from previously publicly declared acknowledgements that it had made a legally binding obligation to provide at least $850 million (Cdn$1 billion) in additional funding to the Debtors over and above the $1 billion committed previously.

115.    At the same time that BCE decided to "pull the plug" on the Debtors, the Debtors were beginning to achieve significant client acceptance of the GlobeSystem in the marketplace. For example, during late 2001 and early 2002, the Debtors had succeeded in signing important new contracts with, among others, Baker & McKenzie, China Telecom, Cisco, Halliburton and Paramount Pictures.

*The Directors' and Officers' Fiduciary Duties Finally Are Discussed*

116.    On April 23, 2002, the TI and BCE boards held a series of late day meetings.  In the presentation materials for the 4:30 p.m. TI meeting, the subject of fiduciary duties of the TI Directors and Officers finally was raised – nearly a year and a half after the closing of the Acquisition and on the eve of bankruptcy.  The TI Directors and Officers were provided with a tutorial as to their duties and liabilities.   The presentation materials questioned whether individuals should be serving on more than one board:

> At this <u>early</u> state, all Directors should participate in the process, although they must be careful to act only in the best interest of the Company and without regard to interests they may have in other capacities … [and] continued participation of cross-directors should be reconsidered going forward (emphasis added).

Five of TI's six directors immediately resigned from the TI board.  The resigning directors – Currie, Kierans, Monty, Michael Sabia, and Anthony Fell – all were serving concurrently as

officers and/or directors of BCE.  Simultaneously, Boychuk (who attended the presentation on fiduciary duties) resigned his positions with TI and the Debtors.

117.   BCE's board then convened at 6:30 p.m. in the very same room and Monty immediately resigned from BCE.  The board accepted the resignations of TI's directors and two new TI directors were appointed.  Finally, the BCE board "determined that it is no longer in the Corporation's interest to provide long term support to Teleglobe, but that it is appropriate to provide for a limited amount of weekly funding to assist Teleglobe in providing continuing customer service while it reviews its options for the future," and approved a press release to that effect.  Even this limited funding was an act of self-interest, as BCE conditioned the funding on its ability to control the wind down of the Debtors' network for BCE's benefit.

118.   TI's new board then met at 11:00 p.m. to discuss options.  They approved a funding request to BCE and a press release stating that "the Company is now pursuing a range of financial restructuring alternatives, potential partnerships and business combinations."  Upon information and belief, one of the conditions for BCE's continued short term support was the commencement of the Canadian insolvency proceedings, which was undertaken in short order.

119.   BCE's press release announcing the abandonment of the GlobeSystem and the termination of funding was issued on April 24, 2002.  In an interview published by the *Globe and Mail*, Monty was reported to have said that he was swept away by the pervasive excitement about the global potential of data transmission, and by overexuberance in wanting to deliver long term growth to BCE.

120.   While Monty and BCE were bemoaning their supposed irrational exuberance, the Debtors were drowning in the debt that BCE had forced them to incur in order to carry out BCE's grand vision.  The inevitable result – bankruptcy – came quickly, and the Debtors

promptly were dismantled in a forced sale of assets.  After the dust had settled, all that BCE had accomplished was to substantially deepen the Debtors' insolvency.

121.    Ironically, although BCE's precipitous and unexpected decision to back out of its funding commitment guaranteed the swift and sudden demise of the Debtors, BCE was able to benefit from its own wrongdoing.  As reported at page 44 of BCE's 2003 Annual Report:

> On December 31, 2002 … we sold all of our common and preferred shares in Teleglobe to the court-appointed monitor for a nominal amount.  The sale triggered approximately $10 billion of capital losses for tax purposes.  We recorded a gain of $1,042 million, relating mainly to the tax benefit from:
>
> - reinstating non-capital loss carryforwards that were previously used to offset gains incurred on the transactions related to the disposition of the Nortel common shares in 2001
>
> - applying a portion of the capital losses against the gain on the sale of the directories business in 2002.

122.    Thus, at the same time that BCE's decision to walk away from its funding commitment to the Debtors led to the loss of more than 1,800 jobs and the wholesale destruction of a business which was gaining market acceptance and momentum, BCE, for its part, actually was able to book a billion dollar gain to its accounts.

123.    The Debtors are pursuing the claims asserted herein against BCE (except for the aiding and abetting claim against BCE, which is being pursued by the Committee) and the Committee is pursuing the claims asserted herein against the TI Directors and Officers and the Debtors' Directors and Officers.  To the extent that there is any inconsistency in the causes of action alleged below, those causes of action are alleged in the alternative.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Funding Commitments Against BCE)

124.    The Debtors repeat and reallege the allegations set forth above.

125.     BCE made enforceable agreements with the Debtors, or with TI with the Debtors as third party beneficiaries, to provide sufficient funding to enable the Debtors to meet their cash needs through 2003.

126.     The Debtors (and TI) performed all of their obligations under the agreements.

127.     BCE breached the agreements in a material way.

128.     The Debtors were harmed by BCE's breach of the agreements.

129.     By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Estoppel Against BCE)**

130.     The Debtors repeat and reallege the allegations set forth above.

131.     BCE made promises to fund the Debtors' cash needs through the completion of the GlobeSystem, upon which promises BCE reasonably expected the Debtors to act in a definite and substantial character.

132.     From June 2000 through April 2002, the Debtors irrevocably changed their positions in reliance upon BCE's promises.  BCE's promises induced the Debtors to continue to build the GlobeSystem at substantial cost and expense, to incur substantial debts, and irrevocably to change their business model to the exclusion of other options, making them totally dependent on BCE until the completion of the GlobeSystem.

133.     BCE broke its promises to the Debtors when it precipitously terminated its ongoing funding, leaving the Debtors with no alternative but to file for bankruptcy.

134.     Injustice only can be avoided by the enforcement of BCE's promises.

135.     By reason of the foregoing, BCE is estopped to deny that it committed to fund the Debtors through the completion of the GlobeSystem.

RLF1-2746253-1

136.    The Debtors were harmed by BCE's conduct.

137.    By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Misrepresentation Against BCE)**

138.    The Debtors repeat and reallege the allegations set forth above.

139.    BCE represented that it would fund the Debtors' cash needs through the completion of the GlobeSystem.    BCE intended that the Debtors would act on those representations.

140.    BCE made untrue statements of material fact and failed to state material facts in order to make its prior statements not misleading.  BCE made these statements with the intent to mislead the Debtors or with reckless indifference as to the truth thereof, or in a negligent manner.

141.    The Debtors justifiably relied on BCE's misrepresentations to their detriment.

142.    The Debtors were harmed by BCE's misrepresentations.

143.    By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty Against BCE)**

144.    The Debtors repeat and reallege the allegations set forth above.

145.    As of no later than November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

146.    As of no later than November 1, 2000, BCE assumed and exercised actual control over the Debtors.  By doing so, BCE assumed fiduciary duties to the Debtors and their creditors.

147.    BCE breached its fiduciary duties by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

148.    The Debtors and their creditors were harmed by BCE's breaches of fiduciary duty.

149.    By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against the Debtors' Directors and Officers)

150.    The Committee repeats and realleges the allegations set forth above.

151.    As of no later than November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

152.    The Debtors' Directors and Officers owed fiduciary duties to the Debtors and their creditors.

153.    The Debtors' Directors and Officers breached their fiduciary duties by consciously and intentionally abdicating their duties and by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

154.    The Debtors and their creditors were harmed by the Debtors' Directors and Officers' breaches of fiduciary duty.

155.    By reason of the foregoing, the Committee is entitled to judgment against the Debtors' Directors and Officers in an amount to be proven at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against the TI Directors and Officers)

156.    The Committee repeats and realleges the allegations set forth above.

157.    As of no later than November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

158.    As of no later than November 1, 2000, the TI Directors and Officers assumed and exercised actual control over the Debtors.  By doing so, the TI Directors and Officers assumed fiduciary duties to the Debtors and their creditors.

159.    The TI Directors and Officers breached their fiduciary duties by consciously and intentionally abdicating their duties and by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

160.    The Debtors and their creditors were harmed by the TI Directors and Officers' breaches of fiduciary duty.

161.    By reason of the foregoing, the Committee is entitled to judgment against the TI Directors and Officers in an amount to be proven at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Breaches of Fiduciary Duty Against**
**BCE and the TI Directors and Officers)**

162.    The Committee repeats and realleges the allegations set forth above.

163.    BCE knowingly aided and abetted the breaches of fiduciary duty committed by the Debtors' Directors and Officers and the TI Directors and Officers.  In addition, the TI Directors and Officers themselves knowingly aided and abetted the breaches of fiduciary duty committed by the Debtors' Directors and Officers.

164.    The Debtors and their creditors were harmed by BCE's and the TI Directors and Officers' conduct.

165.    By reason of the foregoing, the Committee is entitled to judgment against BCE and the TI Directors and Officers in an amount to be proven at trial.

**WHEREFORE,** Plaintiffs demand judgment against defendants as follows:

a.    for damages in such amount as may be proven at trial;

b.    for the costs and attorneys' fees of prosecuting this action;

RLF1-2746253-1

c.      for pre and post judgment interest; and

d.      for such other and further relief as may be just and equitable in the

circumstances.

Dated:   Wilmington, Delaware
         May 26, 2004


AS TO THE FIRST, SECOND, THIRD AND
FOURTH CAUSES OF ACTION

**RICHARDS, LAYTON & FINGER, P.A.**

By: _____
Gregory V. Varallo (No. 2242)
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Attorneys for Teleglobe Communications
Corporation, et al.

AS TO THE FIFTH, SIXTH AND SEVENTH
CAUSES OF ACTION

**ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.**

By: _____
Kevin A. Gross (No. 209)
Joseph A. Rosenthal (No. 234)
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
Telephone:  (302) 656-4433
Facsimile:  (302) 658-7567

               - and -

**HAHN & HESSEN LLP**
John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 478-7200
Facsimile:  (212) 478-7400
Attorneys for the Official Committee of
Unsecured Creditors of Teleglobe
Communication Corporation, et al.