**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TELEGLOBE COMMUNICATIONS | ) | Case No. 02-11518 (MFW) |
| CORP. et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | Jointly Administered |
| | ) | |
| TELEGLOBE USA, INC. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. A-04-53733(MFW) |
| | ) | |
| BCE INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>OPINION</u>**[1]

Before the Court is a discovery dispute where the Plaintiffs seek the production of documents which the Defendants assert are protected by the attorney-client privilege or attorney work product doctrine (the "Motion to Compel") and a related Motion of the Defendants to exclude testimony of the Plaintiffs' experts as a sanction for the spoliation of information considered in forming their opinions (the "Spoliation Motion"). The Motions are opposed. For the reasons set forth below, the Court will deny both the Spoliation Motion and the Motion to Compel.

_____

[1] This Opinion and the accompanying Findings of Fact constitute the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.  BACKGROUND

The Debtors[2] are the wholly owned United States subsidiaries

of a Canadian company, Teleglobe, Inc. ("Teleglobe").  Teleglobe

is a wholly owned subsidiary of BCE, Inc. ("BCE").  Teleglobe and

the Debtors filed petitions under the Canadian Companies'

Creditors Arrangement Act ("CCCAA").  In addition, the Debtors

filed voluntary chapter 11 petitions under the Bankruptcy Code in

the District of Delaware.

The discovery dispute has had a tortured path.  On or about

May 26, 2004, the Debtors and the Creditors' Committee

(collectively "the Plaintiffs") filed an adversary proceeding[3]

against BCE and various officers and directors of BCE (the

"Defendants") in the Bankruptcy Court.  During that proceeding,

the Plaintiffs filed the Motion to Compel.  The District Court

withdrew the reference of the adversary proceeding and referred

the discovery dispute to a Special Master.

After reviewing the approximately 1,000 withheld documents,

the Special Master held that they must all be produced.  The

Special Master concluded that the Defendants had over-designated

---

[2]  The Debtors in the chapter 11 case are Teleglobe USA,
Inc.; Optel Communications, Inc.; Teleglobe Holdings (U.S.)
Corp.; Teleglobe Marine (U.S.) Inc.; Teleglobe Holding Corp.;
Teleglobe Telecom Corp.; Teleglobe Investment Corp.; Teleglobe
Submarine, Inc.; Teleglobe Communications Corp.; Teleglobe
Luxembourg, LLC; Teleglobe Puerto Rico, Inc.

[3]  The suit alleges claims for breach of contract,
promissory estoppel, misrepresentations, breach of fiduciary
duty, and aiding and abetting a breach of fiduciary duty.

as privileged many of the documents (ultimately withdrawing their claim of privilege to thousands of pages of documents) and that production of all of the documents as a sanction might be appropriate.  Further, the Special Master concluded that the Plaintiffs were entitled to all documents relating to the joint representation of BCE and Teleglobe because BCE could not withhold them from Teleglobe and Teleglobe had waived the privilege in favor of the Plaintiffs in its CCCAA plan.  The Special Master also concluded that any privilege with respect to documents from or to BCE's outside counsel had been lost because those documents had been sent to in-house counsel who was jointly representing BCE and Teleglobe.

On June 2, 2006, the District Court accepted the Special Master's recommendations and reasoning and ordered the production of all of the withheld documents.  Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.), No. Civ. 04-1266-SLR, 2006 WL 2567880, at * 2 (D. Del. June 2, 2006).

In a decision dated July 17, 2007, the Third Circuit reversed.  Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.), 493 F.3d 345 (3d Cir. 2007).  The Third Circuit remanded for additional findings of fact on the following issues: (1) Whether any attorneys jointly represented BCE and the Debtors on a matter of common interest, in which case any documents within the scope of that joint representation would be

discoverable.  (2) Whether the fiduciary exception to the
attorney-client privilege[4] is applicable.  (3) Whether the
attorney-client privilege should be abrogated as a sanction for
the Defendants' abuse of the discovery process because of "bad
faith, wilfulness, or fault" on the part of the Defendants or
their counsel.  Id. at 386-87.

On remand, the District Court referred the adversary
proceeding back to the Bankruptcy Court.  After consultation with
counsel for the parties, the Court scheduled an evidentiary
hearing on the factual issues identified by the Third Circuit for
determination in the Motion to Compel.

In preparation for the hearing on the Motion to Compel, the
parties conducted additional discovery, including expert
discovery.  On July 17, 2007, the Defendants filed the Spoliation
Motion[5] asking the Court to exclude the testimony and/or reports

---

[4]  The Third Circuit agreed with the Defendants that the
fiduciary exception does not apply to documents covered by the
attorney work product doctrine.  Teleglobe, 493 F.3d at 385.  The
factual issue of whether the documents in question are covered by
the attorney-client privilege or the attorney work product
doctrine was also remanded.  Id.

[5]  The Spoliation Motion had originally been filed in the
District Court on May 23, 2006; on December 20, 2006, it was
denied without prejudice to being renewed after the appeal was
concluded.  (D.Ct. D.I. 296.) References to the record are as
follows: (1) "Admitted Facts" for the Statement of Facts Which
Are Admitted and Require No Proof, attached to the parties' Pre-
Hearing Order as Exhibit 1A, (2) "Hr'g Tr. [page no.:line no.],
[date]" for the transcript of the hearings, (3) "PX #" for the
Plaintiffs' exhibits, (4) "DX #" for the Defendants' exhibits,
(5) "D.Ct. D.I. #" for the docket in the District Court case, (6)

of two of the Plaintiffs' expert witnesses (Paul Charnetzki and
Carlyn Taylor) because they had destroyed notes, drafts of their
expert reports, and other information that the Defendants
contended the experts had considered in forming their opinions.
The Plaintiffs opposed the Spoliation Motion and a hearing was
held on October 24, 2007.  At the conclusion of the hearing, the
Court denied the Spoliation Motion, but directed counsel for the
Plaintiffs to produce (to the Defendants and to the Court) its
notes of a meeting held between counsel and the experts on March
1, 2006, and copies of emails or other communications in which
counsel or other experts had forwarded comments or information to
the experts for consideration in forming their opinions.

In compliance with the October 26 Order, the Plaintiffs
produced 11 boxes of documents.  On December 3, 2007, the
Defendants filed a response to that document production
contending that the documents produced are no substitute for the
destroyed documents and reiterating their request that the Court
preclude the experts' testimony and/or reports at the trial.
Specifically, the Defendants complain that the Plaintiffs have
produced no notes of the March 1, 2006, meeting between the
experts and counsel.  Instead, the Defendants contend that the
Plaintiffs have produced documents which the experts already

---

"B.Ct. D.I. #" for the docket in the main case in the Bankruptcy
Court, (7) "B.Ct. Adv. D.I. #" for the docket in the adversary
proceeding in the Bankruptcy Court, and (8) "Priv. Doc. Tab #"
for the privileged documents cited in the Special Masters' Final
Report dated February 22, 2006.

identified as having been considered by them in preparing their reports.

The evidentiary hearing on the Motion to Compel proceeded on December 11 to 14, 2007.  The Court permitted the experts to testify, reserving decision on whether to exclude their expert reports.

On April 28, 2008, the parties submitted proposed findings of fact, conclusions of law and briefs.  The matter is ripe for decision.


II.  JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the District Court's referral order dated July 17, 2007.


III. DISCUSSION

A.  Spoliation Motion

After oral argument held on October 24, 2007, the Court concluded that Rule 26(a)(2)(B) did not impose any obligation on a party, its experts or counsel, to preserve and produce drafts of an expert's report.  The Court did, however, conclude that the attorney work product doctrine did not protect information conveyed by an attorney to a testifying expert and, therefore, such information should have been produced.  The Court rejected

the Defendants' assertion that Rule 37 mandates preclusion of testimony by the Plaintiffs' experts, concluding instead that it had discretion to fashion an appropriate remedy.  The Court found preclusion of testimony by the Plaintiffs' experts would cause a substantial hardship for the Plaintiffs.  Accordingly, as a sanction, the Court directed that counsel for the Plaintiffs produce copies of any communications they had with their experts, including any notes that counsel had retained from the March 1 meeting with the experts.  The Court reserved decision on whether any further sanction was appropriate after review of the additional documents produced.  The Court takes this opportunity to further clarify its ruling on the Spoliation Motion.

After their review of the additional documents produced by Plaintiffs' counsel in response to the Court's directive, the Defendants argue that the documents produced are no substitute for the draft expert reports to which they allege they are entitled under Rule 26(a)(2)(B).  Accordingly, they ask the Court to exclude the experts' reports, as a further sanction for the spoliation of the experts' draft reports and notes of their consultations with each other and with Plaintiffs' counsel.

"Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." Univ. of Pittsburgh v. Townsend, No. 3:04-cv-291, 2007 WL 1002317, at *3 (E.D. Tenn. Mar. 30, 2007) (quoting

7

<u>McDaniel v. Transcender, LLC</u>, 119 Fed. Appx. 774, 782 (6th Cir. 2005)).

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides in relevant part that a party must disclose the identity of any testifying expert and "this disclosure must be accompanied by a written report - prepared and signed by the witness . . . . The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information <u>considered</u> by the witness in forming them . . . ."  Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

Prior to 1993, the Rule required production only of the information on which the expert <u>relied</u> in forming his opinion; in 1993 the Rule was amended to require the production of all data which the expert <u>considered</u>.  Information considered by an expert witness includes not only information on which the expert relied but also all information that a testifying expert generated, reviewed, reflected upon, read, and/or used in connection with the formulation of his opinions, even if the testifying expert ultimately rejected the information.  <u>Trigon Ins. Co. v. United States</u>, 204 F.R.D. 277, 282 (E.D. Va. 2001) (noting that "considered" is broader than the term "relied upon" used in the prior rule).

Some courts have held that a necessary implication of the requirement to disclose all information which an expert considered is the duty to preserve that information.  See, e.g., Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co., 412 F.3d 745, 751 (7th Cir. 2005) (concluding that Rule 26(a)(2)(B) "does not require merely that the party disclose data that it happens to have retained; it must disclose all the data that an expert that it retained to testify at trial 'considered,' implying that it must retain those data, as otherwise it could not disclose them."); Trigon, 204 F.R.D. at 282 (concluding that Rule 26(a)(2)(B) "requires, on this record, the retention and production of draft reports and the correspondence reviewed by the testifying expert.").  But see Adler v. Shelton, 778 A.2d 1181, 1192 (N.J. Super. Ct. Law Div. 2001) (concluding that while drafts of expert reports are discoverable, "[e]xperts familiar with the litigation process usually destroy their draft reports and the rules do not forbid this.").

        1.    Draft Reports

The Defendants argue that Rule 26(a)(2)(B) requires that the Plaintiffs' experts produce all drafts of their reports.[6]  See,

---

        [6]  The Defendants also suggest that the failure of the Plaintiffs' experts to maintain drafts of their reports was in violation of the parties' agreement to produce all drafts of their experts' reports.  This agreement, however, was not reached (or even discussed) until after the draft reports were destroyed. (D.Ct. D.I. 276.)

e.g., Elm Grove Coal Co. v. Director, Office of Workers'
Compensation Programs, 480 F.3d 278, 301 (4th Cir. 2007)
(concluding that administrative law judge rule of procedure which
was similar to Rule 26 mandated the production of draft reports
because "we are unable, in these circumstances, to agree that
[the] expert witnesses could be properly and fully cross-examined
in the absence of the draft reports and attorney-expert
communications sought by" the plaintiff); Trigon, 204 F.R.D. at
282; Krisa v. Equitable Life Assurance Soc'y, 196 F.R.D. 254, 256
(M.D. Pa. 2000) (concluding that experts' draft reports are
discoverable under Rule 26); Adler, 778 A.2d at 1192 (concluding
that draft expert report which contained no attorney work product
must be produced).

     In one of the cases cited by the Defendants, however, the
Court acknowledged that there are "cogent reasons" why an expert
may not be required to preserve and produce "the drafts prepared
solely by that expert while formulating the proper language in
which to articulate that experts' [sic] own, ultimate opinion
arrived at by the expert's own work or those working at the
expert's personal direction." Trigon, 204 F.R.D. at 283 n.8.

     The Plaintiffs note that none of the cases cited by the
Defendants are by the Third Circuit or any court in this
District.  In addition, they argue that recent cases have
concluded that experts have no duty to retain draft reports or
produce them absent a pending request for production of drafts.

See, e.g., Townsend, 2007 WL 1002317, at *3 (finding that Rule 26(a)(2) does not "impose an 'affirmative duty' upon an expert to preserve 'all documents,' particularly report drafts . . . . Nor does Rule 26(a)(2) require that draft reports be disclosed as part of an expert disclosure."); McDonald v. Sun Oil Co., 423 F. Supp. 2d 1114, 1122 (D. Or. 2006) (concluding that Rule 26 "does not require the production of an expert's working notes" and that "[i]t was reasonable for the experts to assume that retention of th[e] notes [at issue] was unnecessary" because experts "are not 'required to retain every scrap of paper' created in preparing their opinions."). Like the instant case, the Townsend case involved draft reports and email edits from counsel that were not preserved until a request was made for them. 2007 WL 1002317, at *3.

Because of the split of authority on this issue and the ambiguity in the Rule, the Plaintiffs note that the American Bar Association officially adopted a policy that "an expert's draft reports should not be required to be produced to an opposing party" and recommended that the rules be amended to clarify that draft reports need not be produced in discovery. See ABA Recommendation and Report No. 120A, at 1 (Aug. 7-8, 2006).

The Court is not convinced that the plain language of Rule 26(a)(2)(B) imposes an obligation on a party or its experts to

preserve and produce drafts of an expert's report.  <u>See, e.g.</u>,
<u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 259 F.3d 135, 142 n.7 (3d
Cir. 2001) ("The Supreme Court and this Court have repeatedly
held that the Federal Rules of Civil Procedure, like any other
statute, should be given their plain meaning.").  The Rule does
not expressly include draft opinions in the list of what the
expert must disclose.  Instead, the Rule requires that an
expert's report contain a list of the data and other information
on which he relied.  Fed. R. Civ. P. 26(a)(2)(B).  It does not
seem logical that the Rule would require the final report to
include a list of all the drafts of that report.  Further,
because most experts now draft their reports on the computer,
adding to and subtracting from the document, it would be
impractical to require the production of all drafts.  For
example, any time an expert added or subtracted a section, a
paragraph, a sentence or even a word, the Defendants' reading of
the Rules would require the expert to save the draft and preserve
it for production later.  This is a completely unworkable reading
of the Rules and would mire the courts in battles over each draft
of an expert's report.  The Court concludes that this
interpretation comports with neither the plain meaning of the
Rule nor its policy.

    The Defendants argue, however, that draft reports fall into
the category of data or information "considered" by the expert

and therefore must be produced.  The Court disagrees.  The expert does not really "consider" prior drafts in forming his opinion; the prior drafts are simply preliminary iterations of his opinion.  Rather than "consider" his prior thoughts and statements, in editing the report the expert is considering the underlying data which forms the basis of the revisions.  The data that formed the basis of the draft and final reports of the Plaintiffs' experts in this case have already been disclosed in full and there is no allegation that any of that information was destroyed.  Consequently, the Court concludes that the destruction of their draft reports by the Plaintiffs' experts does not constitute the spoliation of evidence.

 2.   <u>Attorney Work Product Doctrine</u>

The Defendants argue that the draft reports are important in this case, however, because they would have permitted the Defendants to cross examine the Plaintiffs' experts more effectively.  In particular, they argue that changes made to the reports as a result of the March 1, 2006 meeting would have demonstrated that the experts' opinions were influenced by the other experts and by the attorneys for the Plaintiffs.  They argue that because the experts "considered" the comments of the other experts and attorneys, they had an obligation to preserve and produce those comments which were reflected as changes to the draft reports.

13

The Plaintiffs (and their experts) categorically deny that there were any substantive changes to the experts' reports as a result of the March 1 meeting or other conversations with the Plaintiffs' attorneys.  They argue that the one draft of Taylor's report which was produced (dated February 24, 2006) did not differ in any meaningful respect from the final report filed on March 8, 2006, thereby proving that her opinion was not changed as a result of the March 1 meeting.  The Plaintiffs argue that the other drafts which were destroyed similarly would not contain any relevant information.

The Plaintiffs also note that the Defendants' experts also consulted with counsel and incorporated counsel's comments into their reports or excluded sections from their reports at counsel's suggestion.  Although drafts of those reports were furnished, the Plaintiffs argue that it is impossible to determine which changes were counsel's and which were the experts'.

This argument, however, raises a threshold issue: whether the comments of counsel or other experts must be disclosed. Those comments, to the extent they discuss strategy or theories of the case, are protected by the attorney work product doctrine. Hickman v. Taylor, 329 U.S. 495, 512 (1947) (enunciating the attorney work product doctrine as "the general policy against invading the privacy of an attorney's course of preparation" for

trial).  In confirming the importance of the attorney work

product doctrine, the Supreme Court stated that:

> Not even the most liberal of discovery theories can
> justify unwarranted inquiries into the files and the
> mental impressions of an attorney. . . . [because] it
> is essential that a lawyer work with a certain degree
> of privacy, free from unnecessary intrusion by opposing
> parties and their counsel.  Proper preparation of a
> client's case demands that he assemble information,
> sift what he considers to be the relevant from the
> irrelevant facts, prepare his legal theories and plan
> his strategy without undue and needless interference.

Id. at 510-11.

The attorney work product doctrine has been incorporated

into Rule 26(b)(3) which states that "[o]rdinarily, a party may

not discover documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party

or its representative (including the other party's attorney,

consultant, surety, indemnitor, insurer, or agent)."  Fed. R.

Civ. P. 26(b)(3)(A).

There is a split of authority, however, regarding whether

amended Rule 26(a)(2)(B) - which requires that testifying experts

produce all information considered by them in forming their

opinion - trumps Rule 26(b)(3), which protects attorney work

product.

Many courts have held that Rule 26(a)(2)(B) now requires the

production of any document which a party's attorney has given to

the expert, concluding that by giving it to the expert the

attorney work product doctrine has been waived.  See, e.g., Elm

Grove, 480 F.3d at 301 (in analyzing ALJ rule similar to Rule 26,
agreeing with the reasoning of those courts which have held that
Rule 26 mandates such disclosure); Req'l Airport Auth. of
Louisville v. LFG, LLC, 460 F.3d 697, 717 (6th Cir. 2006)
(concluding that "Rule 26 creates a bright-line rule mandating
disclosure of all documents, including attorney opinion work
product, given to testifying experts."); In re Pioneer Hi-Bred
Int'l, Inc., 238 F.3d 1370, 1375 (Fed. Cir. 2001) (concluding
that revised Rule 26 "proceeds on the assumption that fundamental
fairness requires disclosure of all information supplied to a
testifying expert in connection with his testimony. Indeed, we
are quite unable to perceive what interests would be served by
permitting counsel to provide core work product to a testifying
expert and then to deny discovery of such material to the
opposing party."); Dyson Tech. Ltd. v. Maytag Corp., 241 F.R.D.
247, 248 (D. Del. 2007) (concluding that "Rule 26(a)(2)(B)
requires the disclosure of all materials considered by Dyson's
experts, regardless of Dyson's claims of attorney-client
privilege or work-product privilege."); Synthes Spine Co., L.P.
v. Walden, 232 F.R.D. 460, 464 (E.D. Pa. 2005) ("This Court
interprets Rule 26(a)(2)(B) as requiring disclosure of all
information, whether privileged or not, that a testifying expert
generates, reviews, reflects upon, reads, and/or uses in
connection with the formulation of his opinions, even if the

testifying expert ultimately rejects the information."); <u>B.C.F Oil Refining, Inc. v. Consol. Edison Co. of New York, Inc.</u>, 171 F.R.D. 57, 66-67 (S.D.N.Y. 1997) (concluding that amended Rule 26 and the advisory committee's notes are "evidence that the drafters of the rule understood the policies behind expert disclosure and the work product doctrine and have decided that disclosure of material generated or consulted by the expert is more important."); <u>Karn v. Ingersoll-Rand Co.</u>, 168 F.R.D. 633, 639 (N.D. Ind. 1996) (concluding that revised Rule 26(a)(2) mandating disclosure of all information received by an expert trumps Rule 26(b)(3) which protects attorney work product); <u>Intermedics, Inc. v. Ventritex, Inc.</u>, 139 F.R.D. 384, 387 (N.D. Cal. 1991) (holding that "absent an extraordinary showing of unfairness that goes well beyond the interests generally protected by the work product doctrine, written and oral communications from a lawyer to an expert that are related to matters about which the expert will offer testimony are discoverable, even when those communications otherwise would be deemed [attorney] opinion work product."). In support of this conclusion, the <u>Karn</u> Court noted that

> The "bright-line" interpretation [of Rule 26 mandating disclosure of all information received by a testifying expert] expressed here also makes good sense on several policy grounds: effective cross examination of expert witnesses will be enhanced; the policies underlying the work product doctrine will not be violated; and, finally, litigation certainty will be achieved - counsel will know exactly what documents will be subject to disclosure and can react accordingly.

168 F.R.D. at 639.

Those courts rely, in part, on the advisory committee's notes which state that "[g]iven this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinion - whether or not ultimately relied upon by the expert - are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Fed. R. Civ. P. 26 advisory committee's notes (1993). The policy behind the mandated disclosure articulated by the courts is to avoid the

> risk . . . that the lawyer will do the thinking for the expert, or, more subtly, that the expert will be influenced, perhaps appreciably, by the way the lawyer presents or discusses the information. . . . The risks would be reduced, arguably considerably, if it were known that all communications from counsel that accompany the transmission of data [to the expert] would be reviewable by other experts (retained by opposing parties or appointed by the court) and made known to the trier of fact.

Intermedics, 139 F.R.D. at 394.

The quotation from the advisory committee's notes, however, is truncated by the Courts which say it supports production of attorney work product received by an expert. In fact, the beginning of that note clarifies that the expert "is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions." Fed. R. Civ. P. 26 advisory committee's notes (1993) (emphasis added). This suggests that only factual data and information must be produced, not the legal theories or other attorney work product.

18

As a result, many other courts have determined that despite the amendment to Rule 26, information which is protected by the attorney work product doctrine need not be disclosed even if it has been provided to a testifying expert.  Notably, the Third Circuit is in this category.  See, e.g., In re Cendant Corp. Sec. Litig., 343 F.3d 658, 665 (3d Cir. 2003) (citing Bogosian v. Gulf Oil Corp., 738 F.2d 587 (3d Cir. 1984)); St. Marys Area Water Auth. v. St. Paul Fire & Marine Ins. Co., Civ. No. 1:CV-04-1593, 2006 WL 1670281, at *2 (M.D. Pa. June 15, 2006) ("While other courts have found the [ruling in] Bogosian to be 'inapposite' after the 1993 amendments . . . Cendant Corp. makes it clear that Bogosian's holding is still binding on lower courts. . . .  As such, we must find that core attorney work-product cannot be discovered under Rule 26 even if it is disclosed to an expert."); Smith v. Transducer Tech., Inc., 197 F.R.D. 260, 262 (D.V.I. 2000) (concluding that while Bogosian "was decided prior to the 1993 amendments . . . such view still has adherents post 1993") (citations omitted); Krisa, 196 F.R.D. at 260 (based on the language of Rule 26 and the reasoning in Bogosian, concluding that "disclosure of core work product to a testifying expert does not abrogate the protection accorded such information" by the attorney work product doctrine); Moore v. R.J. Reynolds Tobacco Co., 194 F.R.D. 659, 664 (S.D. Iowa 2000) (holding that draft expert reports are protected attorney work product because

"[e]ven when opinion work product is shared with an expert witness in preparation for testifying at trial, [Eighth Circuit precedent] and a reading of Rule 26(b)(3) compel this court to conclude that, in this Circuit, such opinion work product has nearly absolute immunity from discovery."); Magee v. The Paul Revere Life Ins. Co., 172 F.R.D. 627, 642 (E.D.N.Y. 1997) ("Having reviewed the relevant case law, the text of Rule 26(a) and (b) and the associated commentary provided by the advisory committee, the Court holds that 'the data or other information considered by [an expert] witness in forming [his] opinions' required to be disclosed . . . under Rule 26(a)(2)(B) extends only to factual materials, and not to core attorney work product considered by an expert."); Haworth, Inc. v. Herman Miller, Inc., 162 F.R.D. 289, 295 (W.D. Mich. 1995) ("This Court reads [Rule 26] as meaning only that all factual information considered by the expert must be disclosed in the report."); All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co., 152 F.R.D. 634, 638 (D. Kan. 1993) (concluding that "the plaintiff did not waive the protection afforded by Rule 26(b)(3) for attorney work product by sharing the documents in question with its expert witness.").

In Cendant, the Third Circuit analyzed the purported conflict between Rule 26(b)(3) which protects attorney work product from discovery and Rule 26(b)(4) which deals with

depositions of testifying and non-testifying experts.  343 F.3d at 665.  The Court concluded that Rule 26(b)(3) provides an independent basis for protection of attorney work product from discovery.  In so doing, the Court referenced its decision in Bogosian, in which it had concluded that attorney work product is protected under Rule 26(b)(3) from disclosure by a testifying expert.  Id. (citing 738 F.2d at 594).

At the oral argument held on October 24, 2007, the Court was persuaded to follow a decision of the District Court which concluded that Bogosian was no longer good law as a result of the amendments to Rule 26.  Dyson, 241 F.R.D. at 251.  The District Court concluded that the Third Circuit's decision in Cendant was distinguishable because it dealt with the limited disclosures required of a non-testifying expert as opposed to the broad disclosures required of a testifying expert.  Id. at 250 n.3.

On further reflection, however, this Court believes that its initial conclusion was incorrect and concludes that a testifying expert does not have to produce documents which are protected as core attorney work product (i.e., reflects the attorney's mental impressions and trial strategy).  In concluding that Rule 26 disclosures required of non-testifying experts did not trump the attorney work product doctrine in Cendant, the Third Circuit cited with approval its decision in Bogosian that Rule 26 disclosures by testifying experts did not trump the attorney work

21

product doctrine.  <u>Cendant</u>, 343 F.3d at 665.  Therefore, the

Court concludes that the amendments to Rule 26 did not change the

Third Circuit's fundamental decision: that the work product

doctrine articulated in Rule 26(b)(3) is not trumped by the need

to disclose information contained in other provisions of that

Rule.  This Court is bound by the decisions in <u>Cendant</u> and

<u>Bogosian</u> and therefore concludes that the Plaintiffs' experts

were not required to produce any notes of comments made by the

attorneys.

This conclusion is bolstered by the fact that Rule 26(b)(3)

was amended after the <u>Cendant</u> decision.  The amendment eliminated

the language in the first sentence ("[s]ubject to the provisions

of subdivision (b)(4)") that the <u>Cendant</u> Court analyzed.

Instead, the amended Rule states the attorney work product

doctrine affirmatively without the proviso:

> Ordinarily, a party may not discover documents or
> tangible things that are prepared in anticipation of
> litigation or for trial by or for another party or its
> representative (including the other party's attorney,
> consultant, surety, indemnitor, insurer, or agent).

Fed. R. Civ. P. 26(b)(3)(A).  In addition, while the Rule

continues to permit discovery of attorney work product upon a

showing that there is a substantial need and that it cannot be

obtained otherwise without undue hardship, the Rule still

requires the Court to protect "core" attorney work product by

mandating:

> If the Court orders discovery of those materials,
> it must protect against disclosure of the mental
> impressions, conclusions, opinions, or legal theories
> of a party's attorney or other representative
> concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(B).

This language and a more thorough reading of the relevant cases convinces the Court that attorney work product continues to be protected by Rule 26 even if it is shared with a testifying expert. The reasoning of the Krisa Court on this point is persuasive:

> An interpretation of Rule 26 that holds that a party
> must produce documents containing work product that are
> disclosed to its expert ignores the language of Fed. R.
> Civ. P. 26(b)(3), which requires the production of
> documents containing work product only when the
> requesting party shows necessity and undue hardship to
> obtain the substantial equivalent of such documents by
> other means. An interpretation of Rule 26 that
> mandates the production of core work product disclosed
> to an expert would render the language in Rule 26(b)(3)
> superfluous. It is a canon of construction that
> "statutes should be read so far as possible to give
> independent effect to all their provisions."

196 F.R.D. at 260. Accord All West Pet Supply, 152 F.R.D. at 639 (concluding that a party's "burden under Rule 26(b)(3) [to show substantial need and undue hardship] cannot be avoided simply because the attorney's work product document in question was transmitted to his client's expert witness and considered in the course of preparing an expert opinion for purposes of testifying at trial.")

> For the high privilege accorded attorney opinion work
> product not to apply would require clear and

23

> unambiguous language in a statute.  See Hickman [v.
> Taylor], 329 U.S. at 514.  No such language appears [in
> Rule 26].  The Supreme Court in Hickman explained that
> it would be "a rare situation" which would justify
> disclosure of attorney opinion work product.

Haworth, 162 F.R.D. at 295.

Thus, the Court finds that any comments received by the

Plaintiffs' experts from Plaintiffs' counsel or non-testifying

expert are protected by the attorney work product doctrine and

did not have to be produced.

### 3.   Sanctions

Even if there were some discoverable information contained

in the draft reports which were not preserved, the Court

concludes that the drastic remedy sought by the Defendants

(exclusion of the experts' testimony and/or reports) is not

warranted by the facts of this case.

The Defendants rely on Rule 37(c)(1) of the Federal Rules of

Civil Procedure which states in relevant part: "A party that

without substantial justification fails to disclose information

required by Rule 26(a) . . . is not, unless such failure is

harmless, permitted to use as evidence at trial, [or] at a

hearing . . . information not so disclosed."  Fed. R. Civ. P.

37(c)(1).  They contend that this sanction is automatic and

mandatory.  See, e.g., Hammel v. Eau Galle Cheese Factory, 407

F.3d 852, 869 (7th Cir. 2005) (affirming exclusion of expert's

testimony for failure to disclose); Poulis-Minott v. Smith, 388

24

F.3d 354, 358 (1st Cir. 2004) ("The required sanction in the ordinary case is mandatory preclusion."); Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998) ("[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."); American Stock Exchange, LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002) ("Rule 37(c)(1)'s preclusionary sanction is 'automatic' absent a determination of either 'substantial justification' or 'harmlessness.'").

The Plaintiffs assert that the Court has the discretion not to preclude the expert's testimony and reports.  Specifically, the Plaintiffs note that Rule 37(c)(1) provides that "[i]n addition to or in lieu of th[e] sanction [of excluding evidence at trial], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1) (emphasis added).

The Defendants reply that this provision was intended to permit the Court to impose additional, not lesser, penalties. See Fed. R. Civ. P. 37(c)(1) advisory committee's note (1993). See also 7 Moore's Federal Practice § 37.61, at 124 ("The principal reason this provision was added . . . was to provide courts with effective means to discipline parties who might be tempted not to disclose evidence that would be helpful to an opposing party.").

The Court agrees with the Plaintiffs that preclusion under Rule 37(c) should be applied at the Court's discretion.  The Rule expressly states that other sanctions can be imposed "in lieu of" preclusion, not just in addition to preclusion.  Fed. R. Civ. P. 37(c)(1).  Even the cases cited by the Defendants acknowledge that the sanction of exclusion is subject to the trial court's discretion.  See, e.g., Hammel, 407 F.3d at 869 (concluding that the district court did not abuse its discretion in excluding testimony for failure to comply with Rule 26(a)(2)(C)); Poulis-Minott, 388 F.3d at 359 (finding that the district court did not abuse its discretion in denying in part plaintiff's motion to strike late-filed affidavit of an expert); David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003) (concluding that district court did not abuse its discretion when it permitted expert to testify despite failure to disclose); Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1363 (7th Cir. 1996) (holding that "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court"); Design Strategies, 228 F.R.D. at 212 ("Even assuming that Defendants did violate some aspect of Rule 26(e) and that that violation is not substantially justified, though, the Court concludes that Rule 37(c)(1)'s automatic preclusionary sanction is not triggered because there is no basis on the record before the Court on which to find that permitting [the witness] to testify would unjustly harm [the plaintiff].").

Further, the courts agree that the sanction of preclusion of evidence is a harsh punishment which should be imposed only in the most extreme circumstances.  See, e.g., Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) ("[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."); Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71 (2d Cir. 1988) (noting that the "harshest sanctions available are preclusion of evidence and dismissal of the action" and "should be imposed only in rare situations."); Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 111 (E.D. Pa. 2005) ("In choosing an appropriate sanction for the spoliation of evidence, courts should select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.") (internal citation omitted); Trigon, 204 F.R.D. at 288 (concluding that the "assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party."); Kremsner v. Fortuna-SAS, Civ. A. No. 87-1202, 1989 WL 70687, at *1 (E.D. Pa. June 23, 1989) ("Preclusion of testimony . . . [is an extreme sanction] to be imposed only in rare situations. . . . [because it] can be tantamount to dismissal.").

In determining whether the extreme sanction of barring an
expert's report and testimony because of the spoliation of
evidence is warranted, the Third Circuit has articulated the
following test:

> We believe the key considerations in determining
> whether such a sanction is appropriate should be:
> (1) the degree of fault of the party who altered or
> destroyed the evidence; (2) the degree of prejudice
> suffered by the opposing party; and (3) whether there
> is a lesser sanction that will avoid substantial
> unfairness to the opposing party and, where the
> offending party is seriously at fault, will serve to
> deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir.
1994).  In that case, the Third Circuit concluded that the
District Court's sanction of granting judgment in favor of the
defendant was not justified because the defendant did not suffer
severe prejudice and the plaintiff's fault was limited.[7]

### a.   Degree of Fault of Plaintiffs

The Defendants argue that the Plaintiffs' degree of fault is
high in this case because the destruction was deliberate rather
than inadvertent.  The Plaintiffs respond that because of the
split of authority on whether draft reports and notes of

---

[7]   In Schmid the plaintiff's expert had disassembled the saw
involved in the plaintiff's accident to determine why its guard
had failed.  13 F.3d at 77.  Because the plaintiff alleged the
saw was defectively designed (rather than defectively
manufactured), the Court concluded that the defendant's need to
examine the actual saw was limited and that its defense could be
proven as well or better by inspecting and testing multiple saws
of the same design.  Id. at 79-80.

discussions with counsel must be maintained and produced, their degree of fault is not high.

The Defendants argue further that the failure to preserve the draft reports was not substantially justified.  Courts have held that the argument that the documents were destroyed in accordance with normal document destruction policies is frivolous because "a firm's document-retention policy cannot trump Rule 26(a)(2)(B)."  Fidelity, 412 F.3d at 751.  Accord Trigon, 204 F.R.D. at 289.

The Court agrees with the Plaintiffs that their degree of fault in this case is de minimis.  The Plaintiffs' experts did not take physical documents or other evidence and destroy them.  Cf. Schmid, 13 F.3d at 77 (expert "destroyed" evidence by disassembling defective saw and yet no sanction was imposed).  Rather, the Plaintiffs' experts simply made corrections to their reports on their computers and failed to save prior drafts.  It appears that the Defendants' experts did the same.  It would be impossible for the Court to require that all "drafts" of expert reports be produced because it might require that an expert retain and print his report every time a single change was made to it.  This is not required to understand the basis for an expert's opinion and would impede rather than aid cross-examination of the expert.

This case does not involve the wanton destruction of physical evidence that the Rules mean to prevent.  Judge Posner

in the Fidelity case acknowledged that "[t]here is no legal duty to be a pack rat. . . . [A testifying expert] is not required to retain every scrap of paper that he created in the course of his preparation - only documents that would be helpful to an understanding of his expert testimony or that the opposing party might use in cross-examination [need be preserved and produced]." 412 F.3d at 751.  In that case, the Seventh Circuit concluded that the extreme sanction of disallowing the expert's testimony was not warranted and that the expert should have been permitted to testify on areas that were not related to the interview notes that had been physically destroyed.  Id. at 752.

Even if the Plaintiffs were at fault (or not substantially justified in their actions), the Court may still deny the motion to exclude the experts' reports and testimony if it finds no prejudice to the Defendants.

b.   Degree of Prejudice Suffered by Defendants

The Plaintiffs argue that no preclusion is necessary under Rule 37(c)(1) because their failure to disclose was harmless. Specifically, the Plaintiffs contend that the Defendants have had sufficient opportunity to examine the experts on what was discussed at the March 1, 2006, meeting and the basis of their expert opinions, which were not influenced by any comments received from counsel or the other experts.  The Defendants contend that preclusion of the experts' testimony and reports is

30

appropriate in this case because the failure to maintain the
drafts and notes of comments received from others deprived the
Defendants of powerful cross-examination materials.  See, e.g.,
Am. Fid. Assurance Co. v. Boyer, 225 F.R.D. 520, 522 (D.S.C.
2004) ("[I]t is essential during pretrial discovery that the
parties be able to discover 'not only what an opposing expert's
opinions are, but also the manner in which they were arrived at,
what was considered in doing so, and whether this was done as a
result of an objective consideration of the facts, or directed by
an attorney advocating a particular position.'") (quoting
Musselman v. Phillips, 176 F.R.D. 194, 200 (D. Md. 1997)); Karn,
168 F.R.D. at 639 ("[U]seful cross examination and possible
impeachment can only be accomplished by gaining access to all of
the information that shaped or potentially influenced the expert
witness's opinion.").

In this case, the Court finds that the prejudice to the
Defendants is limited; the Defendants were able to cross-examine
the Plaintiffs' experts in depositions and at the December
hearings.  The Defendants had all the data which the Plaintiffs'
experts considered save possible comments to their draft reports
provided in the March 1 meeting or in later telephone
conversations with the Plaintiffs' attorneys and the other
experts.

31

As the Third Circuit noted in <u>Bogosian</u> ,

> cross-examination of the expert can be comprehensive
> and effective on the relevant issue of the basis for an
> expert's opinion without an inquiry into the lawyer's
> role in assisting with the formulation of the theory. .
> . . [T]he marginal value in the revelation on cross-
> examination that the expert's view may have originated
> with an attorney's opinion or theory does not warrant
> overriding the strong policy against disclosure of
> documents consisting of core attorney's work product.

738 F.2d at 595.  <u>See also</u> <u>Townsend</u>, 2007 WL 1002317, at *5

(declining to impose any sanctions for experts' failure to

preserve emails from counsel because it found "that the

defendants have not been prejudiced by the destruction of these

communications, as the defendants have been able to fully cross-

examine the witnesses . . . ."); <u>Haworth</u>, 162 F.R.D. at 295-96

("[A] more effective cross-examination and impeachment of the

opposing party's expert witness . . . is not the type of

circumstance the Supreme Court contemplated would overcome the

strong policy against disclosing an attorney's opinion work

product.  The risk of an attorney influencing an expert witness

does not go unchecked in the adversarial system, for the

reasonableness of an expert opinion can be judged against the

knowledge of the expert's field and is always subject to the

scrutiny of other experts."); <u>Adler</u>, 778 A.2d at 1190-91 (stating

that "[t]he central inquiry on cross examination of an expert

witness . . . is not the question of if and to what extent the

expert was influenced by counsel; rather it is this: what is the

basis of the expert's opinion.  Cross examination on the adequacy and reliability of the stated basis of the expert's opinion can be conducted effectively absent a line of questioning on counsel's role in assisting the expert.").  See generally ABA Recommendation and Report No. 120A, at 5, 11 (Aug. 7-8, 2006) (concluding that there was "no evidence, empirical or otherwise, that suggests that the requirement to produce drafts, to the extent they exist, provides a better method for presenting and assessing an expert's trial testimony[,]. . . . has improved the quality of justice, or that without that disclosure, counsel or the trier of fact has been hindered in the ability to test the merits of an expert's opinion.").

Further, the Court notes that the danger articulated by many courts (that the trier of fact could be misled by an expert's testimony which is influenced by attorneys) is of much less concern in a bench trial than a trial by jury.  See, e.g., In re Unisys Sav. Plan Litig., 173 F.3d 145, 162 (3d Cir. 1999) ("While improper admission of evidence is usually harmless error in a bench trial, the improper exclusion of an expert witness who would have offered a party's sole expert testimony on an element of its case ordinarily is not harmless.").  The real issue is whether the expert's opinion is valid; this can be tested by cross-examination of the expert and the presentation of a rebuttal expert.  In this case, the Defendants were able to do this adequately.

In addition, both Plaintiffs' experts testified that comments from the attorneys and the other experts at the March 1 meeting (or in phone calls) did not change their opinions.  This is substantiated by the draft opinion that Taylor produced from her laptop.  That report was dated February 24, 2006, and did not differ in any significant way from the final report that was dated March 8, 2006.

Therefore, the Court concludes that there was not any prejudice in the Plaintiffs' failure to produce the draft reports of its experts.  Even if there were, however, the Court believes that the cross examination that such evidence would provide is of limited probative value, especially in the bench trial held in this case.  See, e.g., Bogosian, 738 F.2d at 595.

c.  Appropriateness of Lesser Sanction

In this case, the Court is not convinced that every draft of the experts' reports would have been useful in understanding the experts' opinions or in cross examining them.  On balance the Court concludes that the extreme sanction sought by the Defendants is not warranted.  The Court, therefore, concludes that the lesser sanction imposed by it of production of additional notes and documents by the Plaintiffs and their counsel was a sufficient sanction for the violation of the Rules to the extent one was committed by the Plaintiffs and their experts.

B.    Sanctions for Discovery Misconduct

    1.    Bad Faith, Wilfulness or Fault

In its decision, the Third Circuit stated that "[w]e do note that preventing a party from asserting the attorney-client privilege is a legitimate sanction for abusing the discovery process, and we do not foreclose that remedy on remand. Disclosure is a serious sanction, but one that may be imposed only if the . . . Court finds bad faith, wilfulness, or fault." Teleglobe, 493 F.3d at 386 (citing Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of the U.S., 406 F.3d 867, 877 (7th Cir. 2005)). See also Langley v. Union Elec. Co., 107 F.3d 510, 514 (7th Cir. 1997) ("[Discovery] sanctions may only be imposed where a party displays wilfulness, bad faith, or fault.'") (citation omitted).

The Plaintiffs note that the standard for imposing the sanction of required disclosure is in the disjunctive; that is, they need show only that the Defendants displayed one of the categories of offending conduct. See, e.g., Marrocco v. Gen. Motors Corp., 966 F.2d 220, 224 (7th Cir. 1992) (stating that each prong of the test is "wholly distinct from" the others and the presence of any of the three can justify sanctions).

    a.    Bad Faith or Wilfulness

Bad faith is "conduct which is either intentional or in reckless disregard of a party's obligations to comply with a

35

court order." Marrocco, 966 F.2d at 224. Wilfulness is found
where a party has engaged in a "pattern of conduct" in "flagrant
disregard" of the rules of discovery and a specific court order.
DiGregorio v. First Rediscount Corp., 506 F.2d 781, 788 (3d Cir.
1974). Both of those prongs therefore require a finding that the
Defendants failed to comply with a court order directing
production.

The Plaintiffs argue that the Defendants in effect did fail
to comply with this Court's order requiring production under Rule
2004 because at that time the Defendants represented to the Court
that they would produce all documents involved in a joint
representation of Teleglobe and BCE. This was reiterated in the
Defendants' response to the Motion to Compel. Notwithstanding
those representations, the Plaintiffs contend that the Defendants
have not in fact produced those documents but now claim they are
privileged.

The Court is not prepared to find that the Defendants have
not complied with its Rule 2004 Order, however, because as the
Third Circuit noted, there was a serious difference in
understanding between the parties as to what the joint
representation was. Teleglobe, 493 F.3d at 378 (concluding that
the Defendants had not waived the privilege by agreeing to
produce documents sought in the Rule 2004 Motion because "it
appears that BCE agreed to produce documents that fell within its

understanding of the BCE/Teleglobe joint representation, not the masses of documents that [the Plaintiffs sought and] the Special Master eventually found to fall within that category.").

b.  Fault

Relying on the "fault" element, the Plaintiffs argue that the Court should order the turnover of all of the documents at issue as a sanction for the Defendants' over-designation of privileged documents.  The Plaintiffs argue that "fault" does not concern "the non-complying party's subjective motivation, but rather 'only describe[s] the reasonableness of the conduct – or lack thereof – which eventually culminated in the violation.'" Langley, 107 F.3d at 514.  The Plaintiffs argue that the Defendants' conduct with respect to their privilege logs was at fault because it was unreasonable.  In support of this conclusion, the Plaintiffs point to the Defendants' over-designation of almost 33,000 pages of documents, which the Defendant changed only when the Special Master threatened an in camera review of them.  In addition, the Plaintiffs note that the Defendants continually updated, undesignated, and reclassified documents throughout the course of this litigation and the discovery dispute.  By wrongfully designating thousands of pages of documents as privileged in the first place, the Plaintiffs argue that the Defendants deprived the Plaintiffs of the opportunity to conduct thorough depositions, delayed the course

of this litigation by more than a year, and cost the Plaintiffs thousands of dollars in pursuing the Motion to Compel.  The Plaintiffs contend that this course of conduct was not reasonable and seriously prejudiced them.  Therefore, the Plaintiffs argue that the Court should compel the turnover of all of the remaining documents on the Defendants' privilege log.

The Defendants respond that a sanction mandating disclosure of all privileged documents is not appropriate in this case. First, the Defendants contend that the Plaintiffs have failed to prove any improper intent - bad faith, wilfulness, or fault - in the Defendants' over-designation of privileged documents. Specifically, they note that the Plaintiffs presented no testimony on this issue, except the affidavits of Chad Shandler who had no personal knowledge of the Defendants' intent and stated only what documents were undesignated.  Therefore, the Defendants argue that the Plaintiffs rely simply on inferences of fault from the timing and number of undesignated documents.  This they contend is insufficient.

In rebuttal, the Defendants presented the declaration of Jaculin Aaron to explain in detail the procedure used by the Defendants' counsel in reviewing the more than 900,000 documents subject to production.  The Defendants admit that mistakes were made but contend that they were "honest" mistakes occasioned by the breadth of the discovery requests and the extensive amount of

work required of counsel in this litigation.  Further, the
Defendants assert that when mistakes were discovered, they were
corrected and the documents were produced.  See, e.g., Am. Nat'l
Bank, 406 F.3d at 879 (overturning sanction where party conceded
need to revise its initial privilege log, volunteered an amended
log, cooperated with opposing party to try to resolve the
discovery dispute, and promptly complied with the magistrate's
order for production).  Thus, the Defendants argue that the over-
designation does not meet the standard of intent required for
imposition of drastic discovery sanctions.

The Court agrees with the Defendants that the Plaintiffs
have failed to prove that the Defendants' conduct in discovery
constitutes "fault" mandating the production of all privileged
documents.  During the course of this litigation, the Defendants
have produced over 900,000 pages of documents.  The Defendants
originally designated 33,000 documents as privileged which on
further review (and as the issues regarding joint representation
became more focused) were produced.  In complex litigation it is
not unusual for counsel to claim privilege initially as to many
documents which on further review are not covered and have to be
produced.  Am. Nat'l Bank, 406 F.3d at 878-79 ("[I]t is expected
that clients and their attorneys will 'zealously' protect
documents believed, in good faith, to be within the scope of the
privilege.").

39

This is "an area of privilege law that is generally recognized to be 'especially difficult,' namely, distinguishing in-house counsels' legal advice from their business advice." <u>Id.</u> at 879. In this case that difficulty was compounded by the issue of which client held the privilege and whether there was a joint representation of BCE and Teleglobe or BCE, Teleglobe and the Debtors. Its complexity is highlighted by the fact that the Third Circuit devoted almost 20 pages to its discussion of this issue. <u>Teleglobe</u>, 493 F.3d at 359-74, 378-83.

Therefore, the Court is not surprised that the Defendants had to review their privilege log continually to ascertain whether the documents were privileged. Further, the Court is convinced that the Defendants acted promptly in reviewing the privilege log and producing documents when it was determined that the privilege did not apply. The Court does not find that such conduct rises to the level of "fault" meriting the ultimate sanction of mandated production of all privileged documents.

c. <u>Prejudice</u>

In addition, the Defendants argue that any over-designation of documents caused no prejudice to the Plaintiffs. The Defendants note that the Plaintiffs have admitted that most of the withheld documents were only "marginally relevant" to the litigation. In fact, of the 1062 trial exhibits designated by the Plaintiffs, only 48 are documents which were originally

40

designated as privileged by the Defendants (20 of which the Defendants contend are duplicates or similar to other documents already produced).  The Defendants note that although the Plaintiffs claim prejudice in not having these documents available at the depositions, the Plaintiffs have not asked to re-depose a single person.  The Defendants also contend that any cost and delay in this litigation was not all attributable to their discovery conduct.  They note that the Plaintiffs also caused much delay and additional costs in their discovery conduct.  All of this was due to the complex nature of the underlying dispute.

Furthermore, the Defendants contend that, even if some delay and cost is attributable to the Defendants' conduct, it could be addressed by measures far less severe than mandated disclosure of all privileged documents.  <u>See, e.g.</u>, <u>Crown Life Ins. Co. v. Craig</u>, 995 F.2d 1376, 1382 (7th Cir. 1993) ("[A]n award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery.").  The Defendants contend that a monetary sanction, as opposed to the drastic sanction of waiver of the attorney-client privilege, is more proportionate to the harm caused by any conduct of the Defendants.

The Court agrees that, even if the Defendants were at fault in their discovery conduct, the remedy should be limited to monetary sanctions.  This case is far from being ready for trial;

any prejudice to the Plaintiffs from not having all documents
during depositions can be remedied by additional depositions
limited to examination about recently produced documents.  The
Defendants have already been assessed the costs of the Special
Master.  The Court is not convinced that any additional remedy
would be appropriate under the circumstances of this case.

### 2.   Waiver of Privilege

The Plaintiffs argue, however, that they should now have
access to privileged documents because the Defendants waived the
privilege when their witnesses testified at the December hearings
and referred to the privileged documents.

### a.   Turcotte Testimony

The Plaintiffs contend that the Defendants waived the
privilege with respect to certain communications involving
Martine Turcotte, BCE's Chief Legal Officer, when they called her
to testify at the hearings held in December.  The Plaintiffs
contend that this constitutes an "at issue" waiver of privilege
because it placed at issue the subject matter of the privileged
communications.  See, e.g., Tackett v. State Farm Fire & Cas.
Ins. Co., 653 A.2d 254, 259 (Del. 1995) ("The courts of this
State have refused to allow a party to make bare, factual
allegations, the veracity of which are central to resolution of
the parties' dispute, and then assert the attorney-client
privilege as a barrier to prevent a full understanding of the

42

facts disclosed.").  The Plaintiffs contend that there were numerous matters about which Turcotte offered factual testimony that implicated advice given by her or other counsel purporting to act for BCE.  (See B.Ct. Adv. D.I. 116 at 447, 453, 460, 466, 473, 479-80, 488-89, 495, 504, 506-07, 509-10.)  The Plaintiffs argue that they were unable to cross-examine Turcotte effectively on these points without the privileged documents.

The Defendants respond preliminarily that the Third Circuit cautioned in this case that "[i]n discovery disputes, implied waivers are construed narrowly."  Teleglobe, 493 F.3d at 378. The Defendants argue that they have not put the legal advice of BCE's attorneys at issue as evidenced by the fact that they have fought the production of the privileged documents for years through appeal to the Third Circuit and remand to this Court.

The Defendants further dispute the Plaintiffs' contention that Turcotte's testimony put at issue the subject matter of the privileged documents.  Rather, they argue that none of the factual statements made by Turcotte relied on or disclosed privileged legal advice given to BCE.  Instead, they contend that the testimony of Turcotte dealt with facts as she knew them or believed them to be, primarily related to business issues (e.g., whether anyone from the Debtors or Teleglobe told her that BCE was obligated to fund Teleglobe or whether BCE would cease funding Teleglobe).

43

The Court agrees with the Defendants.  The Third Circuit explained:

> In discovery disputes, implied waivers are construed narrowly, In re Lott, 424 F.3d 446, 453 (6th Cir. 2005), and a party is only forced to produce documents under a prospective waiver theory if it agrees to disclose only favorable privileged documents while keeping for itself the unfavorable ones to gain an advantage in litigation.  See Westinghouse [Elec. Corp. v. Republic of Philippines], 951 F.2d [1414] at 1426 n.12 [(3d Cir. 1991)] ("When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary.  If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."); accord Tackett, 653 A.2d at 260 (holding that Delaware courts will only find a prospective waiver when a party uses partial disclosure as a weapon).

Teleglobe, 493 F.3d at 378.

Because of the importance of the attorney-client privilege, "at issue" waiver is narrowly construed and applies only "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."  Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994).  Simply because the information is relevant to the testimony does not mean the privilege has been waived.  See, e.g., In re Sutton, C.A. No. 96M-08-024, 1996 WL 659002, at *9 (Del. Super. Ct. Aug. 30, 1996) (waiver of privileged information cannot be justified "merely to provide the

44

opposing party information helpful to its cross-examination or because information is relevant.") (quoting Remington Arms Co. v. Liberty Mut. Ins. Co., 142 F.R.D. 408, 415-16 (D. Del. 1992)); E.I. DuPont de Nemours & Co. v. Admiral Ins. Co., No. 89C-Au-99, 1994 WL 89447, at *3 (Del. Super. Ct. Feb. 15, 1994).

In this case, the Court finds that none of the testimony of Turcotte disclosed legal advice given to BCE or the content of any of the privileged documents. Although her testimony and the documents may have related to the same subject matter (e.g., Project X), the Court does not find that Turcotte's testimony sought to use the privileged documents as a sword while keeping other information hidden behind the shield of the attorney-client privilege. Rather, her testimony was of her actions and her beliefs and did not refer specifically to the contents of any of the alleged privileged documents. Accordingly, the Court finds that the "at issue" waiver is not applicable here.

### b.   Shapiro Testimony

The Plaintiffs also argue that the Defendants have waived the privilege because the Defendants used privileged documents to refresh the recollection of Mark Shapiro in preparation for his testimony at the December hearings. The Plaintiffs contend that after reviewing those documents, Shapiro testified about the extent of the representation of BCE by Shearman & Sterling LLP ("Shearman") and specifically about documents which the Special

45

Master found evidenced that Shearman represented Teleglobe as
well as BCE.

The Plaintiffs contend that, because Shapiro looked at the
documents to refresh his recollection prior to testifying, the
Defendants must produce those documents pursuant to Rule 612 of
the Federal Rules of Evidence.  See, e.g., James Julian, Inc. v.
Raytheon Co., 93 F.R.D. 138, 145 (D. Del. 1982) (concluding that
using privileged documents to refresh a witness's recollection
constituted waiver of the privilege).  Accord S & A Painting Co.,
Inc. v. O.W.B. Corp., 103 F.R.D. 407, 409 (W.D. Pa. 1984);
Wheeling-Pittsburgh Steel Corp. v. Underwriters Labs., Inc., 81
F.R.D. 8, 9 (N.D. Ill. 1978).

The Defendants argue that Rule 612 does not mandate
production, but is subject to the Court's discretion.  They also
note that the advisory committee note to the Rule expressly
states that "nothing in the Rule [should] be considered as
barring the assertion of a privilege with respect to writings
used by a witness to refresh his memory."  Fed. R. Evid. 612
advisory committee's note.  The Defendants assert that this is
especially true where an attorney is reviewing documents to
establish their privileged nature.  The Defendants contend that
the Plaintiffs' suggestion that Shapiro could not review the
documents in question in preparation for testifying at the
hearing on the issue of whether those documents are protected by
the attorney-client privilege is ludicrous.

46

The Court agrees with the Defendants that the review of the documents at issue by Shapiro did not waive the attorney-client privilege.  By its very terms, Rule 612 commits any disclosure requirement to the Court's discretion.  Rule 612 provides, in relevant part, that

> if a witness uses a writing to refresh memory . . . before testifying, _if the court in its discretion_ determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

Fed. R. Evid. 612 (emphasis added).

"In applying Rule 612, courts must balance the tension between the disclosure needed for effective cross-examination and the protection against disclosure afforded by any relevant privilege."  Suss v. MSX Int'l Eng'g Servs., Inc., 212 F.R.D. 159, 163 (S.D.N.Y. 2002) (concluding that "[t]he privilege would not be lost" where an attorney "review[s] his own already privileged documents.").

In this case, Shapiro was testifying about the nature and scope of Shearman's representation and whether documents prepared by him and Shearman were for BCE alone or for Teleglobe or the Debtors.  Shapiro was an attorney retained by BCE, refreshing his memory years later on the details of his representation for that client in the context of a discovery dispute over privileged communications drafted by him.  It would be unreasonable to

47

expect him to testify without first reviewing the documents at
issue.  Therefore, the Court will exercise its discretion in
favor of nondisclosure.  <u>See, e.g.</u>, <u>Julian</u>, 93 F.R.D. at 146
("Each case [under Rule 612] must, of course, be evaluated on its
own facts.  In a given case the fact that the privileged
documents contained attorneys' mental impressions might cause the
Court to strike the balance in favor of nondisclosure.")  To do
otherwise would defeat the purpose of the discovery-related
litigation.

The Court noted at the December hearings, however, that the
issue of whether the documents establish that Shearman did in
fact represent Teleglobe (and/or the Debtors) as the Special
Master found or that Shearman only represented BCE as Shapiro
testified required an in camera review of the privileged
documents considered by the Special Master on this point.  (Hr'g
Tr. 148:21-150:6, Dec. 14, 2007.)  Therefore, the Court did
review those documents and, as noted below, concludes that they
do support the testimony of Shapiro rather than the conclusion of
the Special Master.

C.   <u>Co-Client Privilege</u>

The Plaintiffs claim that the Debtors were jointly
represented with BCE with respect to the decision to stop funding
Teleglobe, which BCE dubbed Project X.  As a result, the
Plaintiffs contend that the "adverse litigation exception" to the

48

privilege rule applies and requires the turnover to them of all
privileged documents relating to that decision.  "When former co-
clients sue one another, the default rule is that all
communications made in the course of the joint representation are
discoverable."  Teleglobe, 493 F.3d at 366 (citing Restatement
(Third) of the Law Governing Lawyers § 75(2)(2008)).[8]

An attorney-client relationship arises when the client
manifests "intent that the lawyer provide legal services for the
[entity]" and the lawyer "manifests consent to do so" or fails to
"manifest lack of consent."  Restatement (Third) of the Law
Governing Lawyers § 14 (2000).  "The client's intent may be
manifest from surrounding facts and circumstances . . . .  No
written contract is required . . . ."  Id.  When the client is a
corporation . . . whether the lawyer is to represent the
organization . . . or more than one such persons and entities is
a question of fact to be determined based on reasonable
expectations in the circumstances."  Id. cmt. f.

The Plaintiffs contend that the joint representation is
evidenced by (1) the findings of the Special Master as to what

---

[8]   The Third Circuit rejected the Defendants' argument that
where the joint clients are parent and subsidiaries, the default
rule should be that all communications generated in the course of
the joint representation are not discoverable in adverse
litigation.  Id. at 368.  The Third Circuit predicted that the
Delaware Courts would apply the adverse litigation exception in
all situations, even where the joint clients were a parent and
its subsidiaries.  Id.

the withheld documents indicate; (2) facts showing the express
representation of the Debtors by BCE's in-house and outside
counsel; and (3) facts evidencing that there was an implied
representation of the Debtors by BCE's in-house and outside
counsel.  The Defendants argue that the facts do not support the
Plaintiffs' assertions.[9]

       1.   <u>Law of the Case</u>

The Plaintiffs argue that the findings of the Special Master
which were affirmed by the District Court are the law of the
case, to the extent they were not disturbed by the Third Circuit.
The Defendants assert that all relevant findings by the Special
Master have been disavowed by the Third Circuit with instructions
on remand for this Court to determine whether a joint
representation between BCE and the Debtors existed.  <u>Teleglobe</u>,
493 F.3d at 380.

The Court disagrees with the Plaintiffs' argument.  The law
of the case doctrine is discretionary and applies, if at all,
only to a ruling on a point of law.  <u>See</u> <u>Coca-Cola Bottling Co.</u>
<u>of Shreveport v. Coca-Cola Co.</u>, 988 F.2d 414, 429 (3d Cir. 1994).
Thus, the Special Master's factual findings, as adopted by the
District Court, cannot be the law of the case.

_____

   [9]  The Third Circuit concluded, contrary to the Special
Master, that BCE had not waived its argument that it and the
Debtors were not jointly represented by BCE's counsel on a matter
relating to this case.  <u>Teleglobe</u>, 493 F.3d at 377.

Further, the Third Circuit expressly determined that the District Court had not made the requisite factual finding of a joint representation of BCE and the Debtors necessary for production of the documents.  Teleglobe, 493 F.3d at 380 ("Ordering the production of documents on the privilege log must be predicated on a factual finding that BCE and the Debtors were parties to a joint representation.  Because there is no such finding on record, we remand for further factfinding on this issue.")

In addition, the Third Circuit's decision undermined the legal basis for the District Court's and Special Master's findings in several respects.  First, the Third Circuit held that the Special Master's finding of a joint representation of BCE and Teleglobe was not sufficient to warrant production of the documents to the Plaintiffs because such documents are protected by the attorney-client privilege from disclosure to third parties and one party cannot waive that privilege.  The Third Circuit explained that:

> When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for privilege purposes.  Hence the privilege protects those communications from compelled disclosure to persons outside the joint representation. Moreover, waiving the joint-client privilege requires the consent of all joint clients.  Restatement (Third) of the Law Governing Lawyers § 75(2).  A wrinkle here is that a client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; it may not, however, unilaterally waive the

51

> privilege as to any of the other joint clients'
> communications or as to any of its communications that
> relate to other joint clients.

Teleglobe, 493 F.3d at 363.  Thus, even though the Special Master

found that Teleglobe had waived the attorney-client privilege in

favor of the Debtors in its CCCAA plan, that is not effective

because BCE did not consent to the waiver.

Even if there were a joint representation of BCE and the

Debtors, the Third Circuit firmly rejected the broad scope of the

joint representation articulated by the Special Master.  The

Third Circuit stated that the broader rule would permit, in the

context of adverse litigation, a former subsidiary to access all

of its former parent's privileged communications because, as a

matter of law, the subsidiary would be within the parent's

community of interests.  Id. at 379.  Instead, the Third Circuit

stated that "joint representation only arises when common

attorneys are affirmatively doing legal work for both entities on

a matter of common interest."  Id.  The Third Circuit's more

narrow rule ensures that, unless there is affirmative

representation on a common legal interest, sharing of information

would not eviscerate the attorney-client privilege.  Id. at 369.

Therefore, this Court must find that BCE and the Debtors

were jointly represented by counsel on a matter of common

interest relating to the specific issue that is addressed in the

withheld documents for the Debtors to be able to gain access to

those documents.

2.   <u>Express Representation</u>

The Plaintiffs argue that with respect to the decisions on the restructuring and continued funding of Teleglobe, BCE's in-house and outside counsel jointly represented BCE, Teleglobe and the Debtors.  This is evidenced, they argue, by the fact that the only attorneys doing work on those issues were BCE's attorneys. For example, they note that BCE's in-house counsel negotiated the extension of the bank line of credit to Teleglobe, on which Debtor Teleglobe Holdings (U.S.) Corp. was a guarantor.

The Defendants respond that there is absolutely no evidence that the Debtors asked any of the BCE attorneys to represent them with respect to anything.  They further note that all the evidence refutes the Plaintiffs' assertions.  Both Turcotte and Shapiro testified that they never represented the Debtors and only represented BCE.  While the communications between BCE and its counsel with respect to continuing to fund Teleglobe may have referenced or indirectly affected the Debtors, the Defendants contend that at no time were BCE's attorneys representing anyone other than BCE.  Simply because Teleglobe, and possibly the Debtors, were the subjects of communications between BCE and its attorneys does not mean that they were clients of BCE's attorneys.

The Court agrees with the Defendants that the facts do not support the Plaintiffs' argument.  At the hearings held before this Court in December 2007, the Plaintiffs presented no evidence

to demonstrate that the Debtors expressly conveyed their desire
for, or consent to, representation by any counsel for BCE.  There
was no engagement letter from any counsel to BCE and the Debtors
jointly.  BCE and the Debtors had separate in-house legal staff;
the Debtors' in-house legal staff handled all of their
operational legal matters.

The fact that only BCE's attorneys were considering the
possible restructuring and funding needs of Teleglobe does not
mean that they were representing the Debtors' interests as well.
In fact, the Court finds that there was no common interest
between BCE (the potential provider or guarantor of the funds)
and the Debtors (the indirect recipient of the funds).  Thus, the
Court concludes that there was no explicit joint representation
of BCE and the Debtors by counsel for BCE relating to BCE's
decision to fund or not fund Teleglobe.

### a.   Single Enterprise

The Plaintiffs assert that there was evidence of a direct
representation of the Debtors and BCE by BCE's in-house and
outside counsel because BCE treated Teleglobe and the Debtors as
a single enterprise.  As a result, the Plaintiffs argue that
where BCE's counsel represented Teleglobe they also represented
the Debtors.

The Court rejects the Plaintiffs' argument.  The Third
Circuit cautioned that "absent some compelling reason to
disregard entity separateness, in the typical case courts should

54

treat the various members of the corporate group as the separate corporations they are and not as one client." <u>Teleglobe</u>, 493 F.3d at 372.

In this case the facts show that there was not a single enterprise for purposes of attorney-client representation.  Each of the Debtors, Teleglobe and BCE are separate corporations.  Teleglobe and BCE are Canadian corporations; the Debtors are U.S. corporations.  Many of the Debtors were in businesses that did not involve Teleglobe's GlobeSystem; many Teleglobe subsidiaries other than the Debtors were involved in the GlobeSystem.

It is true that upon its acquisition of Teleglobe, BCE had its in-house legal department handle some matters for Teleglobe on an ad hoc basis (securities compliance, capital markets, and mergers and acquisitions).  That did not, however, mean that BCE was handling those matters for the Debtors.  In fact, the Debtors had their own in-house and outside counsel who handled their legal matters.  Even the Plaintiffs' representative, Kathleen Morgan, who had been an in-house counsel with the Debtors, verified that the Debtors' in-house legal group handled the Debtors' own legal matters, especially relating to corporate governance and operational matters.  Morgan (and the general counsel for the Debtors, John Brunette) testified that the Debtors' in-house counsel did not report to BCE or Teleglobe, had authority to independently hire outside counsel, and did not seek BCE's approval of their legal budget.

The Plaintiffs assert, however, that evidence proving that the Debtors, Teleglobe and BCE were a single enterprise is found in the functioning of their boards of directors.  They note that many of the board members of Teleglobe and BCE were also board members of the Debtors and that there is no evidence that the Debtors' boards ever met for an official, documented board meeting.  Thus, they assert that the Teleglobe and BCE boards acted as the de facto board of the Debtors, thereby establishing they were a single enterprise.

The Defendants respond that the Debtors' boards functioned through their management teams which were in constant communication with each other and, therefore, there was no need to convene formal board meetings.  They further note that the Debtors' boards executed written resolutions in lieu of board meetings in accordance with the dictates of Delaware law.

The Court concludes that the facts do not support the Plaintiffs' contention.  Only a small number of the thirty-plus officers or directors of the Debtors were also employees, officers, or directors of Teleglobe or BCE.  The Court concludes that the mere overlap of a few directors or officers, without more, does not present a "compelling reason to disregard entity separateness" and treat the entities as a single enterprise.  Id. at 372.

Further, there is no evidence that BCE's or Teleglobe's board met and made decisions for the Debtors.  The absence of board meetings by the Debtors is not evidence that the BCE or Teleglobe board acted on their behalf, but rather reflects the management team style the Debtors' boards utilized.  Under Delaware Law, "any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing."  8 Del. C. §141(f) (1996).  See also Bowers v. Columbia Gen. Corp., 336 F. Supp. 609, 614 (D. Del. 1971) (holding that corporate action without a formal directors' meeting was proper under 8 Del.C. 141(f) where the requisite consent form is signed by all directors).  As a result, the Court finds that the Debtors' failure to hold official board meetings does not mean that the board meetings held by BCE or Teleglobe were also meetings of the Debtors' board.

            3.  <u>Waiver</u>

The Plaintiffs contend, however, that the attorney-client privilege was waived because the overlapping board members of the Debtors attended Project X meetings where legal advice was given to BCE.  The Plaintiffs argue that in the absence of an explicit statement that the legal advice was meant for the overlapping board members only in their capacity as BCE representatives, the

disclosure to them constitutes a waiver and/or demonstrates a co-client relationship between BCE and the Debtors relating to Project X.

The Defendants respond that the overlapping board members understood that Project X involved legal issues discrete to BCE and in receiving that advice were acting as representatives of BCE, not the Debtors.  Therefore, the Defendants contend that the mere fact that the board members were overlapping did not constitute a waiver of the attorney-client privilege.  See, e.g., In re Fuqua Indus., Inc. S'holders Litig., No. Civ. A.11974, 1999 WL 959182, at *2 (Del. Ch. Sept. 17, 1999) (holding that the presence of several directors on the boards of two corporations does not waive the attorney-client privilege because doing so would have "disastrous effects on cross-directorships," providing the example where a director sitting on multiple boards would be constantly excusing herself in an attempt to preserve privilege on certain documents).

The Court agrees with the Defendants.  The attendance at BCE or Teleglobe board meetings by directors who were also directors or officers of the Debtors did not constitute a waiver of the attorney-client privilege.  Teleglobe, 493 F.3d at 372 (holding that "it does not break confidence to share an attorney-parent communication with an officer of the parent in her capacity as officer of the parent, even though she is also a director or officer of a subsidiary.").

4.   Implied Joint Representation

The Plaintiffs argue nonetheless that there was an implied joint representation because they shared a common legal interest with Teleglobe and BCE in several areas.  The Third Circuit acknowledged that "nothing prevents joint representations from arising by implication" but cautioned that "courts must be careful not to imply joint representation too readily." Teleglobe, 493 F.3d at 362.  The Third Circuit held that the joint client privilege must be narrowly drawn to include only those communications as to which the related companies have a community of interest because "even in the parent-subsidiary context a joint representation only arises when common attorneys are affirmatively doing legal work for both entities on a matter of common interest."  Id. at 379.  The extent of a common legal interest is determined by the parties' intent and the interaction of the lawyers.  Id. at 363.

a.   Public Filings

The Plaintiffs argue that the public filings made by BCE and Teleglobe show that there was an implied joint representation of the Debtors by counsel for BCE.  Specifically, they argue that counsel for BCE had to communicate with the Debtors to obtain information necessary for those filings (including the Debtors' financial results).  They argue that this evidences a joint representation.

59

The Court disagrees with the Plaintiffs' contentions.  The Debtors were not required to make any public filings because they had no public debt or equity; therefore they needed no legal representation with respect to those filings.  It was only Teleglobe and BCE, as public companies, that were required to make public filings, not the Debtors.  Although BCE's counsel communicated with the Debtors with respect to those filings, it was as counsel for BCE (and possibly Teleglobe) to assure that the necessary information was accurate and included in the filings.  Therefore, the Court finds that there was not a joint representation of the Debtors relating to the public filings made by Teleglobe.[10]

        b.   Retention of Advisors

The Defendants argue that the lack of a joint representation is evidenced by the fact that when BCE recognized the potential for a divergence of interest between it and Teleglobe, separate advisors were retained for Teleglobe.  The Plaintiffs contend,

---

        [10]  Even if there was a joint representation of the Debtors by BCE's counsel with respect to the public filings, the scope of that representation would be limited.  In this regard, the Third Circuit stated that:

> When, for example, in-house counsel of the parent seek information from various subsidiaries in order to complete the necessary public filings, the scope of the joint representation is typically limited to making those filings correctly.  It does not usually involve jointly representing the various corporations on the substance of everything that underlies those filings.

Teleglobe, 493 F.3d at 372-73.

instead, that the retention of those advisors proves that BCE's counsel was representing the Debtors as well as BCE, especially with respect to Project X.

### i.  Davies Ward

On April 8, 2002, BCE determined that Davies Ward, which had previously represented it, should represent Teleglobe.  Davies Ward ceased representing Teleglobe on April 17, 2002, within a short period of being engaged, when BCE decided it should continue representing BCE on other matters.  During the time it purported to represent Teleglobe, Davies Ward continued to represent BCE in connection with Project X.  The Plaintiffs argue that Davies Ward was clearly representing both BCE and Teleglobe on Project X at the same time, thereby triggering the adverse litigation exception and mandating the turnover of all Project X documents to the Plaintiffs.

The Court disagrees.  The Third Circuit noted that "when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct."  Teleglobe, 493 F.3d at 368 (citing Eureka Inv. Corp. v. Chicago Title Ins. Co., 743 F.2d 932, 937-38 (D.C. Cir. 1984) (holding that the scope of the joint-client relationship, as intended by the parties, determines the scope of the attorney client-privilege, and clients should not be deprived of this privilege solely because of the lawyer's

61

misconduct)). Consequently, the Court concludes that even if Davies Ward was improperly representing BCE and Teleglobe, there is no clear evidence that both parties intended Davies Ward to represent them jointly with respect to Project X.

The Court finds convincing the testimony of both Brunette and Turcotte that the parties did not intend this. Not only did Brunette confirm that he intended no joint representation of the Debtors with BCE, but he went so far as to warn the Debtors not to view BCE's legal counsel as their own. Turcotte also testified that it was BCE's intention to receive separate legal advice regarding Project X and specifically BCE's own legal exposure in the event it decided to cease funding Teleglobe.

Further, any joint representation by Davies Ward of Teleglobe and BCE does not extend to the Debtors, without any evidence of an express representation of the Debtors by Davies Ward. No evidence was presented by the Plaintiffs to this effect. Consequently, the Court concludes that the adverse litigation exception is not implicated by the retention of Davies Ward.

ii. <u>Shearman and Stikeman</u>

In late March and early April, BCE retained Shearman & Sterling ("Shearman") and Stikeman Elliot ("Stikeman") to analyze BCE's legal exposure should it decide to stop funding Teleglobe. Because BCE's attorneys met with and communicated with Teleglobe

and the Debtors about Project X, the Plaintiffs argue that they were co-clients of Shearman and Stikeman.  They note specifically the findings by the Special Master that two memos prepared by Shearman were addressed to Teleglobe and discussed issues that might arise in the event that Teleglobe and/or the Debtors filed bankruptcy.

The Court concludes that Shearman and Stikeman were representing BCE alone.  A review of the memos in question reveals that although they contained information <u>about</u> the Debtors, they did not appear to convey legal advice to the Debtors.  Further, Shapiro testified that they were <u>not delivered to</u> the Debtors but were provided only to BCE and constituted legal advice given to BCE alone.  In fact, Shapiro testified unequivocally that his firm represented only BCE, not Teleglobe or the Debtors; their work product (and their bills) were given only to BCE.  Therefore, the Court concludes that the Debtors were not the intended recipients of the legal advice contained in the memos and were not represented by Shearman or Stikeman. Thus, on the evidence presented, the Court concludes there was no attorney-client relationship between the Debtors and Shearman or Stikeman.

### iii. <u>Lazard and Ernst & Young</u>

Similarly, the Plaintiffs argue that BCE's involvement in the engagement of Ernst & Young ("E&Y") and Lazard Freres & Co.,

LLC ("Lazard") as advisors for the Debtors and/or Teleglobe
relating to Project X proves that there was a co-client
relationship between BCE and the Debtors.  The Plaintiffs note
that Turcotte wrote the engagement letter for Lazard and
negotiated the terms of the E&Y retention.  Further, the
Plaintiffs point to the fact that BCE was authorized to view any
of Lazard's or E&Y's work-product.  The Plaintiffs contend that
this is evidence of the common legal interest (and thus co-client
relationship) among BCE, Teleglobe and the Debtors in Project X.

The Defendants respond that Turcotte's role in the
engagement of Lazard and E&Y was discrete and minimal and does
not evidence a joint representation.  Although Turcotte drafted
the engagement letters, they were in fact executed by
representatives of the Debtors and/or Teleglobe.  Further, the
Defendants note that although the Debtors and/or Teleglobe could
disclose their advisors' work product to BCE, BCE could not
demand disclosure.

The Court agrees with the Defendants that the involvement of
BCE in the retention of Lazard and E&Y by Teleglobe did not
create or evidence a co-client relationship between BCE and the
Debtors.  Turcotte's involvement in drafting the engagement
letters was ministerial.  The letters and actions of the parties
make it clear the advisors were representing the Debtors and/or
Teleglobe only.  Although some of Lazard's conclusions were

64

shared with BCE, that was natural because BCE was the ultimate parent and a logical source of funding of any reorganization effort.

        c.   <u>Project X</u>

       The Plaintiffs argue nonetheless that the interaction between BCE's legal counsel and the Debtors with respect to Project X created a co-client relationship.  The Plaintiffs argue that the Debtors had a significant and direct common interest with Teleglobe and BCE regarding the continued BCE funding and viability of Teleglobe because they had no other source of funding.  This, they argue, created a common interest with Teleglobe and BCE in the issues addressed by counsel in connection with Project X.

       The Defendants disagree.  They contend that Project X was an undertaking by BCE to identify a viable business plan for Teleglobe so that BCE could make an informed business decision relating to its continued funding of Teleglobe.  They argue that Project X also addressed the legal exposure BCE would face should it cease funding Teleglobe.  Consequently, BCE argues that the Debtors shared no common interest in Project X with BCE.

       Overall, the actions of the parties and their legal and other representatives demonstrate that the parties did not intend a co-client relationship between BCE and the Debtors in connection with Project X.  Rather than a common interest with

Teleglobe and the Debtors, BCE's interest in whether to continue
to fund Teleglobe was not aligned with Teleglobe or the Debtors.
Consequently, the Court concludes that the parties did not share
a common interest with respect to Project X and those
communications are protected under the attorney-client privilege.

The Plaintiffs contend, however, that BCE waited "until late
in the game" to clarify who was representing whom and on what
subject matter.  Consequently, the Plaintiffs claim the Debtors
relied on BCE's legal counsel to act as their counsel as well
during Project X meetings.

The Court finds that any "implication" that BCE's counsel
were representing the interests of the Debtors during Project X
is refuted by the evidence.  Both Turcotte and Shapiro testified
categorically that neither was representing the interests of
Teleglobe or the Debtors in Project X; they were only
representing BCE.  Further, Brunette, as general counsel for the
Debtors, understood that the Debtors could not rely on BCE's
legal counsel as evidenced by the fact that he advised the
Debtors' officers "not to speak with BCE lawyers" and "not to
disclose confidential information."  This is further evidenced by
the fact that separate counsel and advisors were hired for
Teleglobe and the Debtors.

Thus, the Court concludes that the Debtors did not share a
common interest with BCE in connection with Project X and that

66

BCE's attorneys working on that Project were not representing the Debtors' interests.  Consequently, the Debtors are not entitled to production of the privileged documents dealing with Project X.

D.    Fiduciary Exception

The Plaintiffs maintain nonetheless that the fiduciary exception to the attorney-client privilege applies in this case and warrants production of the documents at issue.  Garner v. Wolfinbarger, 430 F.2d 1093, 1103-04 (5th Cir. 1970).  Garner evolved as an exception to the attorney-client privilege in the corporate context when "the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, [and] protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." Id.

The Defendants argue that Garner is inapplicable in this case for two principal reasons.  First, they argue that the Court should apply Canadian law, which does not recognize the Garner exception to the attorney-client privilege.  Second, the Defendants assert that even if the Court applies Delaware law, the facts of this case would not warrant application of Garner.

1.    Canadian Law vs. Delaware Law

Canadian law does not recognize a fiduciary exception to the

67

attorney-client privilege, while the Delaware courts do.  Compare
FCMI Fin. Corp. v. Curtis Int'l Ltd., [2003] O.T.C. 1020, [2003]
O.J. No. 4713 (declining to apply the "new rule" enunciated in
Garner based on the Supreme Court of Canada's emphasis that the
"'solicitor-client privilege must be as close to absolute as
possible[,]' . . . will yield only in clearly defined
circumstances, and does not involve a balancing of interests on a
case by case basis") with Grimes v. DSC Commc'ns Corp., 724 A.2d
561, 568 (Del. Ch. 1998) (discussing Garner and noting that
"[w]hile the attorney-client privilege may be asserted by a
corporation that has sought legal advice, 'the privilege is not
absolute and an oft-invoked exception applies in suits by
minority shareholders.'") (internal citations omitted).
Therefore, the laws of Delaware and Canada are in conflict.

     The Defendants contend that application of conflict of laws
rules mandates that Canadian law governs this dispute because of
Canada's "most significant relationship with the
communication[s]" and special considerations of international
comity.  Restatement (Second) of Conflict of Laws § 139(2)(1971).

     With respect to privileged communications, the Restatement
states that:

          (2) Evidence that is privileged under the local law of the
          state which has the most significant relationship with the
          communication but which is not privileged under the local
          law of the forum will be admitted unless there is some
          special reason why the forum policy favoring admission
          should not be given effect.

68

Restatement (Second) of Conflict of Laws § 139(2) (emphasis added).

The Defendants cite comments c and d to section 139, which explain the rationale for the Restatement and provide the following factors to be considered in determining which state has the most significant relationship with the communication: "(1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved, and (4) fairness to the parties." Id. cmt. d.

Applying those factors, the Defendants argue that Canada has the "most significant relationship" to the communications at issue because BCE is a Canadian corporation and the documents at issue were prepared as a result of BCE's communications with its attorneys.  The Defendants contend that the documents in question have no contact with the forum, Delaware.  Therefore, they assert that fairness mandates that Canadian law be applied.

The Defendants do not, however, cite any "special reason why the forum policy favoring admission should not be given effect." Id. at § 139(2).  Their arguments are simply that the documents are privileged under Canadian law.  Therefore, the Court concludes that the "default" rule under the Restatement applies here and that the forum's policy (i.e., Delaware law) governs the production of the documents at issue.  Id.

69

Even if the Defendants had established special circumstances suggesting that Canadian law applies, the Plaintiffs argue that Delaware law must be applied because of the internal affairs doctrine.  The internal affairs doctrine "governs the choice of law determinations involving matters peculiar to corporations, that is, those activities concerning the relationships inter se of the corporation, its directors, officers and shareholders" and "requires that the law of the state of incorporation should determine issues relating to internal corporate affairs." McDermott, Inc. v. Lewis, 531 A.2d 206, 215 (Del. 1987).  See also Teleglobe, 493 F.3d at 386 (citing In re Topps Co. S'holders Litig., 924 A.2d 951, 960 (Del. Ch. 2007)).

The Court agrees with the Plaintiffs.  The issue at hand is undoubtedly one which is peculiar to corporations - a dispute between subsidiaries and parent over certain communications and actions relevant to a suit between them alleging breach of fiduciary duty.  The Court concludes that the extent of corporate attorney-client privilege which arises in a case alleging breach of fiduciary duty by officers, directors and the shareholder of a Delaware corporation falls within the ambit of "matters peculiar to corporations."  McDermott, 531 A.2d at 215.  See also Topps, 924 A.2d at 960 (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs).  Thus, the Court holds that the

internal affairs doctrine is applicable and mandates the application of Delaware law to this dispute.

       2.   <u>Availability of Garner under Delaware Law</u>

The Defendants argue, however, that even if Delaware law is applied to this dispute, the Delaware Supreme Court has not and would not apply the <u>Garner</u> fiduciary exception in these circumstances.  They argue that, by inviting courts to assess factors for overturning privilege, <u>Garner</u> is inconsistent with the Supreme Court's admonition that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."  <u>Jaffee v. Redmond</u>, 518 U.S. 1, 18 (1996) (<u>quoting</u> <u>Upjohn Co. v. U.S.</u>, 449 U.S. 383, 393 (1981)).

The Court rejects the Defendants' argument.  <u>Garner</u> is not an arbitrary standard that has rarely been applied in Delaware. Rather, the Delaware Courts have found that <u>Garner</u> provides a "workable and logical framework for analyzing claims of lawyer-client privilege in the context of shareholder suits" which the "Delaware courts have consistently followed."  <u>Deutsch v. Cogan</u>, 580 A.2d 100, 105, 106 (Del. Ch. 1990).

Though <u>Garner</u> has not been expressly adopted by the Delaware Supreme Court, it has been cited and applied with regularity by Delaware courts.  <u>See</u> <u>Zirn v. VLI, Corp.</u>, 621 A.2d 773, 781-83 (Del. 1993) (evaluating "good cause" factors of <u>Garner</u> in

production dispute); <u>Ryan v. Gifford</u>, Civ. A. No. 2213-CC, 2008
WL 43699, at *4 (Del. Ch. Jan. 2, 2008); <u>Ryan v. Gifford</u>, Civ. A.
No. 2213-CC, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007);
<u>Grimes</u>, 724 A.2d at 568 (discussing the <u>Garner</u> fiduciary
exception and applying the "good cause" factors of <u>Garner</u>).

Further, the Third Circuit predicted that <u>Garner</u> would be
expanded to apply to a case (such as this one) where an action is
brought by a corporation (or its creditors) rather than by
minority shareholders, if the corporation is found to be
insolvent.  The Third Circuit explained that

> BCE, as the ultimate owner of more than half (and,
> indeed, all) of the Debtors' voting power, owed them
> the duties of care and loyalty.  If the Debtors were
> solvent, then all duties flowed back up to BCE as the
> only party with a legitimate interest in the Debtors'
> success.  If that were the case, then BCE is correct
> that it effectively owed the Debtors no duties.
> However, if the Debtors were insolvent, then their
> creditors also had a legitimate interest in their
> success.  With multiple stakeholders, BCE's duties of
> care and loyalty would come into play in the same way
> that the directors' duties did in <u>Garner</u>, and its
> attorney-client privilege could be set aside by showing
> good cause.

<u>Teleglobe</u>, 493 F.3d at 386 (internal citations omitted).

Applying the analysis used by the Third Circuit, the Court
predicts that the Delaware Supreme Court would adopt the <u>Garner</u>
doctrine and apply it under these circumstances.[11]  <u>See, e.g.</u>, <u>In</u>

---

[11]  The Defendants argue that because it is unclear whether
<u>Garner</u> should be applied in the instant case, this Court should
certify the question of <u>Garner</u>'s applicability to the Delaware
Supreme Court under Rule 41(a)(ii) of the Rules of the Supreme

re Prof'l Ins. Mgmt., 130 F.3d 1122, 1125 (3d Cir. 1997) ("In interpreting state law, we must predict how the highest court of that state would decide the relevant legal issues.").

>    3.   Application of Garner

To satisfy the requirements of Garner as interpreted by the Third Circuit, the Plaintiffs must establish that they were insolvent at the time of the communications in question and that there is "good cause"[12] for the production.   Teleglobe, 493 F.3d at 386.   If the Plaintiffs satisfy these requirements, the fiduciary exception applies and the documents must be produced.

>    a.   Insolvency

Preliminarily, the Plaintiffs contend that they need make only a colorable showing of insolvency to meet the requirements of Garner.   The Court disagrees.   The Third Circuit held that to

---

Court of Delaware.   That Rule, however, does not permit a Bankruptcy Court to certify a question to the Delaware Supreme Court.   See Del. R. S. Ct. 41(a)(ii)(2008).

[12]   In order to determine "good cause," the Court should consider the
> nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; . . . whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

Garner, 430 F.2d at 1104.

avail themselves of the Garner exception, the Plaintiffs must prove the Debtors' insolvency. Teleglobe, 493 F.3d at 385. If the Debtors were solvent, the fiduciary duties were owed only to the shareholder (i.e., BCE). Id. at 386. It is only if the Debtors were insolvent that any duties would be owed to the creditors. Id.

Once the Plaintiffs prove insolvency, however, it is true that they need only show that they "have a colorable claim of breach of fiduciary duty to show 'good cause'" for production of the privileged documents. Id. at 385. Therefore, the Court concludes that the Plaintiffs must prove that they were insolvent at the relevant time in order to apply the Garner exception.

The Plaintiffs seek production of documents reflecting communications which occurred between November 2001 and April 2002. The Plaintiffs assert that the Debtors were insolvent throughout the relevant period. The Defendants disagree, maintaining that Teleglobe and the Debtors were solvent until at least April 23, 2002. Until that date, the Defendants argue, Teleglobe and the Debtors were able to pay their debts as they came due with BCE's funding support.

At the evidentiary hearings held on December 11 to 14, 2007, the Plaintiffs presented the testimony of their expert, Paul Charnetzki, who opined that Teleglobe was insolvent during the relevant period. The Defendants presented Joshua Livnat as an expert to rebut Charnetzki's testimony.

The Plaintiffs argue that under Delaware law, a corporation is insolvent when its liabilities exceed its assets or when it is unable to pay its debts as they fall due.  See, e.g., U.S. Bank Nat'l Assn. v. U.S. Timberlands Klamath Falls, L.L.C., 864 A.2d 930, 947 (Del. Ch. 2004), vacated on other grounds, 875 A.2d 632 (Del. 2005) ("In Delaware, insolvency is defined in two ways. First, a company is insolvent if it is 'unable to pay its debts as they fall due in the usual course of business.'  Second, a company may be insolvent if 'it has liabilities in excess of a reasonable market value of assets held.'") (citations omitted); Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business.  That is, an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held.") (internal citation omitted).

In its opinion, the Third Circuit cited a definition of insolvency under the balance sheet test that is more narrow: "a corporation is insolvent if it has: '1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business.'"  Teleglobe, 493 F.3d at 384 (emphasis added) (quoting Production Resources Group, LLC v. NCT Group, Inc., 863 A.2d 772, 782 (Del. Ch. 2004)).

The Plaintiffs argue that the Third Circuit's addition of the requirement that there be "no reasonable prospect that the business can be successfully continued" adds an unreasonable qualifier to the basic definition of insolvency.  The Plaintiffs further contend that the Production Resources case is distinguishable because it dealt with the appointment of a receiver which they argue requires a higher standard of insolvency.  863 A.2d at 782.

The Court disagrees.  The Production Resources Court also addressed the fiduciary duties to creditors that attach "when a firm has reached the point of insolvency." Id. at 790-91.  The Court applied its definition of insolvency to that situation as well. Id. Further, Delaware courts have recognized the Production Resources definition of insolvency in situations similar to the instant case. See, e.g., N. Am. Catholic Educ. Funding Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 98 (Del. 2007) (evaluating the viability of direct claims for breach of fiduciary duty brought by creditors against directors of a Delaware corporation that is insolvent or in the zone of insolvency and recognizing the Chancery Court's determination that insolvency "may be demonstrated by either showing (1) 'a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,' or (2) 'an inability to meet maturing obligations

76

as they fall due in the ordinary course of business.'")
(citations omitted).

Consequently, as instructed by the Third Circuit and
Delaware case law, this Court will employ the <u>Production
Resources</u> definition of balance sheet insolvency for purposes of
determining if the <u>Garner</u> exception applies.

i.   <u>Balance Sheet Test</u>

The Plaintiff's expert, Charnetzki, testified that he
applied the balance sheet test and concluded that Teleglobe and
the Debtors were insolvent beginning in September 2001.  Instead
of doing a balance sheet test, however, Charnetzki simply
calculated the average of certain investment bankers' assessments
of the enterprise value of Teleglobe and compared that to the
total amount of Teleglobe's debts.[13]  Charnetzki did not even do
this much with respect to the Debtors, because there were not any
investment bankers' valuations of the Debtors at that time.

Charnetzki further opined that any funding actually provided
by BCE, beyond the initial $1 billion authorized in June 2000,
had to be ignored because the additional funding was not
contractually binding.  Based on those assumptions, Charnetzki

_____

[13]  Charnetzki did not use all of the investment bankers'
valuations done at the time, however, because he found some were
not reasonable.  He also felt all of them were inflated, because
they assumed that funding, including that provided by BCE, would
be available and assumed that Teleglobe's GlobeSystem would
become operational.

77

found that the Debtors' liabilities exceeded the value of their
assets and that they were, therefore, balance sheet insolvent on
the dates in question.

The Defendants disagree with Charnetzki's application of the
balance sheet test, arguing that he applied the wrong standard of
insolvency, relied only on select portions of the investment
bankers' analyses (which are hearsay), and erroneously excluded
the support of BCE.  The Defendants emphasize that BCE was trying
to build Teleglobe, and its GlobeSystem, into a major company,
was continuing to fund Teleglobe, and was evaluating options
(such as joint ventures) to make Teleglobe a successful venture.
Therefore, the Defendants argue that the continued support of BCE
and the likelihood of success must be considered when evaluating
the Debtors' balance sheet.  Cf. Davidoff v. Farina, No. 04 Civ.
7617(NRB), 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005)
(in the context of allegations of securities law violations,
noting that "it would have made no economic sense for defendants
to invest literally billions of dollars in a venture that they
knew would fail").

The Court agrees with the Defendants.  Charnetzki did not do
a balance sheet analysis himself.  Instead, he took selective
analyses done by others and "averaged" them without any analysis
of their validity.  This is not an accepted methodology for
performing a balance sheet test.  Fed. R. Evid. 702  ("If

78

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."). See also In re Nellson Nutraceutical, Inc., 356 B.R. 364, 367, 375 (Bankr. D. Del. 2006) (rejecting an expert's "invented [valuation] methodology").

Further, the Court finds that Charnetzki did not consider any valuations of the Debtors' assets (as opposed to Teleglobe's) because none were done at that time.   In addition, Charnetzki ignored some valuations of Teleglobe done at the time which he found unfavorable to the Plaintiffs' position.   Therefore, the Court concludes that Charnetzki's opinion that the Debtors were insolvent under the balance sheet test is unsupportable.

Even if Charnetzki's testimony were based on accepted methodologies, however, the Court still finds it unconvincing. The Third Circuit instructed that the relevant solvency inquiry with respect to the Debtors' balance sheet is whether the Debtors had "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof."   Teleglobe, 493 F.3d at 384 (quoting Production

79

Resources, 863 A.2d at 782).  Under this standard, as long as
Teleglobe was actually receiving funding from BCE, there were
reasonable prospects that the business of the Debtors could be
continued.

Charnetzki acknowledged that, under the "likelihood of
success" standard, the Debtors' solvency hinged upon the
likelihood that BCE would continue funding.  Because BCE's
funding was not contractual, however, Charnetzki did not include
it as a resource in the balance sheet test.  Charnetzki opined
that the Debtors had no reasonable prospects of continuing their
business based on contemporaneous industry reports reflecting
troubled times for the data and telecommunications businesses
rather than the positive outlooks expressed at the time by
Teleglobe and BCE.

Again, the Court finds that Charnetzki's approach is flawed.
In addition to its contractual $1 billion commitment to Teleglobe
in June 2000 and its efforts to extend Teleglobe's credit
facilities, BCE continued to invest cash to finance Teleglobe's
operations.  This included board authorization for $75 million in
October 2001 and an additional $850 million in November 2001.
BCE actually provided Teleglobe with $300 million in additional
funding under the board authorizations between November 2001 and
April 2002, when the climate in the industry was especially
harsh.

As it funded Teleglobe during this period, BCE started
Project X to find a viable business plan that would enable
Teleglobe to weather the data industry storm.  While Teleglobe
may have had a deficiency of assets below its liabilities without
consideration of BCE's funding, the Court concludes that it did
not lack reasonable prospects of continuing its business until
April 23, 2002, when BCE announced that it would no longer fund
Teleglobe.

The Defendants' expert, Livnat, opined that Teleglobe was
not insolvent until it was "virtually certain that there would
not be any other opportunity to bail them out by the time that
the payments would become due."  Livnat determined that date to
be as early as the April 23, 2002, BCE board resolution to cease
funding and as late as May 2002 when Teleglobe actually defaulted
on its debt.  While the Court does not endorse this "virtual
certainty" test, it finds that under the Third Circuit's solvency
standard, Teleglobe and the Debtors had reasonable prospects of
continuing their businesses until BCE announced its intention to
cease funding.

The Defendants also contend that the balance sheet test is
an unreliable indicator of solvency in this case because
Teleglobe was a start-up business.  See Francotyp-Postalia AG &
Co. v. On Target Tech., Inc., No. 16330, 1998 WL 928382, at *5
(Del. Ch. Dec. 24, 1998) (dismissing the balance sheet test in

81

favor of the more reliable cash flow test in the context of a start-up company because it "is all too common, especially in the world of start-up companies . . . to operate with liabilities in excess of its assets for that condition to be the sole indicia of insolvency.").

The Plaintiffs argue that Teleglobe was not a start-up company because it had been operating since the 1950s and generated significant revenues from its legacy voice business. The Court disagrees with this contention.  BCE purchased Teleglobe in 2000 because of Teleglobe's GlobeSystem, which was initiated in May 1999, not because of its voice business.  The GlobeSystem was a pivotal element of the acquisition and, therefore, the Court concludes that the Teleglobe which BCE purchased was, at least in part, a "start-up operation."

Consequently, the Court concludes that Charnetzki's balance sheet approach is not persuasive.  Therefore, the Court cannot conclude that Teleglobe and the Debtors were insolvent prior to April 23, 2002, when BCE ceased its funding of Teleglobe.

ii.  Cash Flow Test

To prove the Debtors' insolvency, Charnetzki also applied the "cash flow test" (also called the "inability to pay debts" test) to determine whether the Debtors were able to pay their debts as they came due in the ordinary course of business.  He applied the test to Teleglobe and the Debtors on a consolidated

82

basis as well as to the individual Debtors.  Using this test,
Charnetzki concluded that the Debtors were insolvent on September
30, 2001, December 31, 2001, March 31, 2002, and April 30, 2002,
despite the fact that neither Teleglobe nor the Debtors actually
ceased paying its debts as they came due until May 2002.

In reaching this conclusion, Charnetzki again excluded from
consideration the funding that BCE actually provided to Teleglobe
(and indirectly to Teleglobe's subsidiaries, the Debtors) beyond
its initial $1 billion infusion because that funding was not
contractually required and, therefore, not certain to come to
fruition in the future.  The Plaintiffs argue that this "forward-
looking" approach is a standard application of the cash flow test
and that Charnetzki properly excluded BCE's parental support from
his evaluation due to its contingent nature.  See, e.g.,
Blackmore Partners, L.P. v. Link Energy LLC, No. Civ. A 454-N,
2005 WL 2709639, at *3 (Del. Ch. Oct. 14, 2005) (stating that the
cash flow test "examines whether a company can 'reasonably meet
its anticipated fixed (on-balance sheet and contingent)
obligations as they become due.'") (citations omitted).

In addition, Charnetzki included the principal balance of
the bank debt as an obligation.  He noted that Teleglobe's bank
facility came due in July 2002 and could not be paid in the
absence of BCE's support.  Because BCE's support could not be
assured, Charnetzki included the fixed bank obligation without

considering any parental support.  See, e.g., Mellon Bank, N.A.
v. Official Comm. of Unsecd. Creds. of R.M.L, Inc. (In re R.M.L.,
Inc.), 92 F.3d 139, 156 (3d Cir. 1996) (noting that "if a
debtor's treatment of an item as an 'asset' depends for its
propriety on the occurrence of a contingent event, a court must
take into consideration the likelihood of that event occurring
from an objective standpoint.").  As a result, Charnetzki
concluded that the Debtors were insolvent as defined by the cash
flow test during the relevant period.

The Defendants contend that Charnetzki misapplied the cash
flow test.  The test, the Defendants argue, is not meant to
predict whether, in the future, the entity will be able to pay
its debts but rather evaluates whether an entity is actually able
to pay its debts as they mature in the normal course of business.
See, e.g., Pereira v. Farace, 413 F.3d 330, 343 (2d Cir. 2005)
(rejecting a cash flow test similar to Charnetzki's because that
"Cash Flow test projects into the future to determine whether
capital will remain adequate over time while the Delaware test
looks solely at whether the corporation has been paying bills on
a timely basis . . . .").  In this case, the Defendants argue
that the Debtors were able to pay all of their debts as they came
due through April 23, 2002, when BCE announced it would no longer
fund Teleglobe.  The Defendants contend that BCE's ongoing
support for Teleglobe and the Debtors was evidenced inter alia by

84

the board resolution of November 28, 2001.  That resolution,
though not a binding contract, authorized an additional infusion
of $850 million into Teleglobe.  Between that date and April 23,
2002, BCE did provide funding under that authorization to
Teleglobe to permit it and the Debtors to pay their debts as they
came due.  Thus, the Defendants argue that BCE's actual funding
of Teleglobe should not have been ignored in Charnetzki's cash
flow analysis.

The Court agrees with the Defendants.  The cash flow test is
"forward looking" in the sense that "[i]t is not enough to be
able to meet current obligations; the firm must be able to meet
its future obligations as well."  J.B. Heaton, Solvency Tests, 62
Bus. Law 983, 989 (2007).  Even so, the Court finds that it was
not appropriate to exclude from the cash flow test the funding
support actually given by BCE in determining whether the Debtors
were insolvent in the six months before BCE ceased that funding.
See, e.g., In re EBC I, Inc., 380 B.R. 348, 359 (Bankr. D. Del.
2008) (determining that a company was solvent under the cash flow
test because it was "able to pay, intended to pay, and in fact
was paying its debts as they came due" as of the relevant date).

The authority that the Plaintiffs cite to bolster
Charnetzki's approach does not support his far-reaching
conclusion.  Indeed, Heaton's article acknowledges that "neither
cash flows (sources of assets) nor debt obligations (liabilities)

85

are certain," but they nonetheless must be considered as part of the analysis.  62 Bus. Law at 989.  Uncertainty such as that which existed in the funding by BCE is normal in any cash flow analysis.

Further, the Plaintiffs' citation to the <u>Mellon Bank</u> case is unavailing as that case dealt with the balance sheet test for insolvency under the Bankruptcy Code, not the Delaware cash flow test.  92 F.3d at 154-56.  Even so, in examining a debtor's assets to determine solvency, the Third Circuit in <u>Mellon Bank</u> held that "a court looks at the circumstances <u>as</u> <u>they</u> <u>appeared</u> <u>to</u> <u>the</u> <u>debtor</u> and determines whether the debtor's belief that a future event would occur was reasonable." <u>Id.</u> at 156 (emphasis added).  In the instant case, the Court finds that from the Debtors' perspective, BCE's support was not uncertain.  Shortly after the acquisition of Teleglobe, BCE injected $1 billion into the company, with professed intentions to continue to support Teleglobe.  On November 28, 2001, BCE adopted a board resolution authorizing an additional $850 million in funding to Teleglobe.  Between that date and April 2002, BCE actually provided approximately $300 million to Teleglobe.  Therefore, it would be reasonable for the Debtors to believe that BCE's funding would continue.

Thus, the Court concludes that it was inappropriate for the Plaintiffs' expert to exclude from consideration the funding that

actually occurred simply because it was not mandatory.  See,
e.g., Iridium Operating, LLC v. Motorola, Inc., 373 B.R. 283, 298
n.5 (Bankr. S.D.N.Y. 2007) (discussing Motorola's support of
Iridium in the absence of any enforceable commitment for such
support and noting that there is nothing to indicate that such
"support is not a proper factor to be taken into account in
determining solvency").

     BCE's actions during the relevant period were consistent
with its actions since the acquisition of Teleglobe; it provided
continuous financial support to its subsidiary, Teleglobe, and
acted as if it intended to continue doing so for the foreseeable
future.  It appears that BCE's concerns relating to the health of
the industry and the viability of Teleglobe arose only in early
2002.  Until BCE announced its decision to cease funding
Teleglobe on April 23, 2002, however, it was not unreasonable for
the Debtors to count on BCE's support for the purposes of a cash
flow analysis.  By failing to do so, the Court concludes that
Charnetzki's cash flow test is flawed.

     Further, Charnetzki's conclusion that the Debtors were
insolvent between November 2001 and April 2002 because the bank
loan came due in July 2002 and could not be refinanced is equally
flawed.  There is no evidence that prior to April 23, 2002, the
Debtors were not paying current debt service on that loan.
Further, the loan had been renewed with BCE's commitment of $1
billion in 2000 and with BCE's statement that it "intended" to

continue to support Teleglobe in 2001.  Therefore, from the

Debtors' perspective, it was reasonable to assume that, with

BCE's support, the loan would again be renewed in 2002.

Because Teleglobe (and the Debtors) reasonably relied on the

support of BCE and actually paid their debts as they came due,

the Court finds that Teleglobe and the Debtors were solvent under

the cash flow test until April 23, 2002, when BCE announced that

it would no longer fund Teleglobe.

Therefore, the Court concludes that the Plaintiffs have

failed to prove insolvency between November 2001 and April 2002

under either the cash flow or the balance sheet test.  As a

result, the Plaintiffs have failed to satisfy the first

requirement of <u>Garner</u>.  Therefore, the Court need not consider

the second element of the <u>Garner</u> test (whether there is good

cause for production).  The Court concludes that the Plaintiffs

cannot compel production of the documents at issue by means of

the <u>Garner</u> fiduciary exception.


IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court will deny both the

Spoliation Motion and the Motion to Compel.

An appropriate Order is attached.


Dated: August 7, 2008                    BY THE COURT:


                                         Mary F. Walrath
                                         United States Bankruptcy Judge